[ECF No. 17]

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

INNA KHARTCHENKO,

             Plaintiff,

    v.

THE AMERICAN ONCOLOGIC
HOSPITAL, INC. et al.,

             Defendants.

**Civil No. 23-23043 (ESK/EAP)**

### OPINION

This matter comes before the Court on the motion of Defendants, the American Oncologic Hospital, Inc. ("AOH"), the Institute for Cancer Research (named as Fox Chase Cancer Center) ("FCCC"), and Temple University Health System, Inc. ("TUHS") (collectively, the "Corporate Defendants") to Strike and Seal Attorney-Client Privileged Communications, ECF No. 17. Plaintiff Inna Khartchenko opposed the motion, ECF No. 23, and the Corporate Defendants filed a reply, ECF No. 24. The Court has reviewed the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1. For the following reasons, the motion will be **GRANTED IN PART and DENIED IN PART**.

### FACTUAL BACKGROUND[1]

**A.**    **The Parties**

Defendant AOH was one of the nation's first cancer hospitals established in 1904, and in union with the Institute for Cancer Research, formed FCCC in 1974. *See* ECF No. 1-3, First

---

[1] The facts are taken directly from the First Amended Complaint.

Amended Complaint ("FAC") ¶¶ 14-15.  In 2012, FCCC became part of TUHS, and since then, the Corporate Defendants have operated as joint entities to service patients from across the world in the Greater Philadelphia region and South Jersey.  *Id.* ¶¶ 16–18.

Plaintiff Inna Khartchenko is an immigrant of Russian and Ukrainian origin with a Master of Science in Biochemistry and Molecular Biology and a Master of Business Administration.  *Id.* ¶ 22.  In approximately 2007, the Corporate Defendants hired Plaintiff as the Associate Director of Business Development and in 2015, they promoted her to the Director of Technology Transfer.  *Id.* ¶¶ 19-20.  In 2018, her responsibilities were expanded to include New Ventures programs.  *Id.* ¶ 21.  According to the FAC, her employment was "without issue" until she (1) complained that Defendant Sangeeta Bardhan Cook, the Chief Innovation Officer for FCCC and Senior Vice President of Commercialization Strategy and Business Development for TUHS, made discriminatory comments to Plaintiff; (2) reported Cook for retaliating against her by attempting to deny her a necessary medical accommodation for her disability; and (3) objected to Defendants' business dealings with a Russian company.  *Id.* ¶¶ 7, 30.

### B.    Defendant Cook's Alleged Pattern of Discriminatory Conduct and Retaliation

Cook began her employment with the Corporate Defendants in August 2022.  *Id.* ¶ 36.  On October 27, 2022, Cook sent a Microsoft Teams message to Plaintiff about Corporate Defendants' President and Chief Executive Officer, Robert Uzzo, and Corporate Defendants' Cancer Center Director Jonathan Chernoff, remarking that Uzzo and Chernoff were "two white guys" who only cared about samples from underrepresented patient populations because the National Cancer Instituted "forced them" to care.  *Id.* ¶¶ 39-40.

Over the next several months, Cook made additional comments that Plaintiff found offensive, many of which were of an allegedly antisemitic nature.  *Id.* ¶¶ 44-47.  Plaintiff objected to Cook's comments by explaining that many of her friends are Jewish and that she grew up with

Jewish students and teachers. *Id.* ¶¶ 48-50. Beyond the antisemitic comments, Cook regularly made harassing comments about many of Plaintiff's colleagues, some of which Plaintiff believed showed that Cook had a pattern of discrimination against persons with disabilities. *Id.* ¶¶ 51-56.

In November 2022, Plaintiff went to the emergency room with extreme abdominal pain and was diagnosed with a serious ovarian condition. *Id.* ¶ 58. She reported to Cook that she was scheduled for surgery on January 9, 2023. *Id.* ¶ 59. Although Cook suggested that Plaintiff could take Family and Medical Leave Act ("FMLA") leave, Plaintiff opted to continue her previous remote work arrangement and continue working throughout her recovery, with sick time taken only as needed. *Id.* ¶¶ 60-70.

Between January 12, 2023, and January 27, 2023, Plaintiff worked remotely while using approximately two sick days per week. *Id.* ¶ 71. During this time, Plaintiff recognized a change in Cook's behavior toward her, as she began "to heavily scrutinize" her work. *Id.* ¶¶ 73-74. On January 23, 2023, Plaintiff decided to report Cook's alleged pattern of discriminatory behavior—focusing on her antisemitic comments and increased scrutiny of Plaintiff's work after her surgery—to Corporate Defendants' Cancer Center Director, Jonathan Chernoff. *Id.* ¶¶ 75-77. Just days later, on January 28, 2023, Cook informed Plaintiff that she had to retroactively use FMLA leave for her sick days after her surgery and that she could not work until she presented a physician's clearance note. *Id.* ¶ 78. On January 30, 2023, Cook began to target Plaintiff's work-from-home arrangement and presented Plaintiff with an accommodation form to be signed by her physician for her to remain working from home. *Id.* ¶ 81. Although Plaintiff's accommodation request was approved through May 13, 2023, it was "imminently clear to Plaintiff" that Cook was beginning the process to revoke her remote work arrangement. *Id.* ¶ 87.

On February 2, 2023, Plaintiff reported this increasing retaliation to Corporate Defendants' Human Resources department, specifically Defendant Amber Medlin. *Id.* ¶¶ 84-85. Corporate

Defendants purported to investigate Plaintiff's complaints and interviewed Plaintiff on February 15, 2023, via Zoom from her home office in New Jersey.  *Id.* ¶ 86.  During the investigation period, Plaintiff alleges that she suffered stress that contributed to complications from her surgery.  *Id.* ¶¶ 88-89.  In the wake of the investigation, Cook publicly criticized Plaintiff, micromanaged her, made her look incompetent, and excluded her from important meetings.  *Id.* ¶ 90.

On April 14, 2023, Cook informed Plaintiff that she had to be on site three days per week beginning May 1, 2023, because of her "director-level" position.  *Id.* ¶ 92.  Cook also instructed Plaintiff to write a return-to-office ("RTO") plan for her team, even though she had not thought about office space.  *Id.* ¶ 93.  Cook rejected Plaintiff's plan and sent RTO instructions to Plaintiff and her team.  *Id.*  Plaintiff objected to Cook's plans to revoke the work-from-home arrangement for multiple reasons, but Cook refused to consider Plaintiff's objections.  *Id.* ¶¶ 94-95.

### C.    Plaintiff's Whistleblower Complaints Regarding the Corporate Defendants' Business Affiliations

On March 28, 2023, Plaintiff participated in a Zoom meeting with Cook and Corporate Defendants' Licensing Associate, Tatiana Venkova.  *Id.* ¶ 99.  Cook informed Plaintiff that, because Plaintiff spoke Russian, she needed her help negotiating with a company based out of Moscow, Russia (hereinafter the "Russian Company") that held the rights to a promising anti-cancer drug.  *Id.* ¶¶ 100-01.  Plaintiff was "immediately apprehensive" about working on this project due to her Ukrainian heritage and the ongoing conflict between Russia and the Ukraine.  *Id.* ¶¶ 104-05.  She also worried that the Corporate Defendants' affiliations with a Russian company could pose serious problems for Corporate Defendants both legally and ethically.  *Id.* ¶ 106.

Given her concerns, Plaintiff conducted approximately thirty minutes of research of publicly-available information and discovered that the Russian Company was owned by the Russian Venture Company—part of the Russian Direct Investment Fund—which has direct ties to the

Russian government and was sanctioned by the United States for violations of international law. *Id.* ¶¶ 107-09. Based on this research, Plaintiff believed there was a substantial risk with the Corporate Defendants' plans to acquire the intellectual property covering the drug. *Id.* ¶ 111.

Plaintiff raised her concerns with Cook and remarked that proceeding with the deal would be in direct violation of President Biden's Executive Orders involving Russia-related sanctions. *Id.* ¶¶ 112-13. Plaintiff also objected to the business dealing as highly unethical. *Id.* ¶ 114.

On April 11, 2023, Corporate Defendants' General Counsel, Jerome Maddox, emailed Plaintiff and Cook about the deal. *Id.* ¶ 116. Plaintiff immediately responded that she had concerns that she would like to share with Maddox. *Id.* ¶ 118. During the April 14, 2023 Teams call with Cook and Maddow, Plaintiff reiterated that she believed it was unethical for the Corporate Defendants to negotiate and enter into a deal with a company likely financed by a sanctioned Russian entity. *Id.* ¶ 121. The next day, Plaintiff followed up by writing to Maddox and suggesting that he have law enforcement agencies check into the Russian Company. *Id.* ¶ 122. Maddox did not respond to the email but instead called Plaintiff on April 18, 2023, and told her that the Corporate Defendants would "be okay with the PR" if the deal went forward. *Id.* ¶ 123.

On April 17, 2023, Plaintiff sent a complaint to Cook stressing that Cook was planning to give the Russian Company project to Plaintiff "without disclosing all the information and informing [her] of the concerns associated with it." *Id.* ¶ 126. Plaintiff emphasized that had she not done due diligence and share her concerns, Cook "could have gotten [Plaintiff] involved in this project without [her] knowing all the problematic background information surrounding it," which "could have created serious problems for [her] in the future, personally, and professionally." *Id.*

### D.    <u>Alleged Retaliation</u>

One day after Plaintiff's email to Cook about the Russian Company deal, and only a few days after Plaintiff's complaints about Cook's revocation of her remote work accommodations,

Corporate Defendants' "investigation" into Plaintiff's complaints from February about Cook's behavior ended. *Id.* ¶ 127. Plaintiff inquired into the results of the investigation; on April 18, 2023, John Lasky, Corporate Defendants' Executive Vice President and Chief Human Resources Officer, emailed Plaintiff to inform her that her allegations were unfounded and that the February investigation did not uncover anything unlawful in Cook's conduct. *Id.* ¶ 128. In response to Plaintiff's follow up questions, Lasky noted that there was no "unlawful" conduct. *Id.* ¶ 130.

Cook and Medlin then scheduled a Teams meeting for the following day with Plaintiff, during which they issued Plaintiff a final written warning and placed her on a performance improvement plan ("PIP"). *Id.* ¶¶ 131-32. The final written warning described Plaintiff's reports as "assuming malicious intent in others." *Id.* ¶ 134. When Plaintiff asked how she could receive a final warning if she never received any warnings during her fifteen years of service to the Corporate Defendants, Cook ignored her. *Id.* ¶ 135. According to Plaintiff, the final written warning stated that she had been on notice of her unsatisfactory performance for six months. *Id.* ¶ 136. Plaintiff alleges, however, that during her work tenure with the Corporate Defendants, she consistently received stellar performance reviews. *Id.* ¶¶ 138–45.

On April 20, 2023, Plaintiff's counsel sent Corporate Defendants notice of intent to file this lawsuit, and counsel filed the complaint the following day. *Id.* ¶¶ 148-49. Over the next two months, Plaintiff was required to meet with Cook on a weekly basis as part of her PIP, and she complained that these were retaliatory disciplinary measures. *Id.* ¶¶ 150-51. Although Plaintiff worked long hours over the next two months to avoid termination, Cook allegedly took every opportunity to make Plaintiff's job more difficult. *Id.* ¶¶ 152-54.

Plaintiff had her final weekly check-in meeting with Cook on June 21, 2023, and when she logged on from home, she found Cook and Medlin waiting for her. *Id.* ¶¶ 156-57. At that time, Cook

terminated Plaintiff's fifteen-year employment with the Corporate Defendants based on alleged performance issues.  *Id.* ¶¶ 158, 160.

### E.    Procedural History

On July 11, 2023, Plaintiff filed suit in the Superior Court of New Jersey.  *See* ECF No. 1 (Notice of Removal) ¶ 3.  On November 7, 2023, Plaintiff filed a First Amended Complaint setting forth five causes of action: (1) disparate treatment and discrimination due to disability under the New Jersey Law Against Discrimination, N.J.S.A. 20:5-1 *et seq.* ("NJLAD"); (2) failure to accommodate and failure to engage in the interactive process under the NJLAD; (3) discrimination, hostile work environment, and disparate treatment due to religion, national origin, and/or ethnicity under the NJLAD; (4) retaliation/improper reprisal under the NJLAD; and (5) retaliation in violation of New Jersey Conscientious Employee Protection Act ("CEPA"), N.J.S.A. 34:19-1 *et seq.*  Notice of Removal ¶¶ 5, 7.  On December 13, 2023, Defendants removed this action to this Court.[2]  *See generally* Notice of Removal.

On January 19, 2024, the Corporate Defendants filed the present Motion to Strike and Seal Confidential Attorney-Client Privileged Communications Improperly Disclosed in Plaintiff's Complaint and First Amended Complaint.  *See* ECF No. 17 ("Defs.' Motion").  Plaintiff filed an opposition on February 6, 2024.  *See* ECF No. 20 ("Pl.'s Opp.'n").  The Corporate Defendants filed a reply.  *See* ECF No. 22 (Defs.' Reply).  Having been fully briefed, this matter is ripe for disposition.

### STANDARDS OF REVIEW

### A.    Motion to Strike

Pursuant to Federal Rule of Civil Procedure 12(f), the Court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ.

---

[2] On December 20, 2023, Defendants moved to dismiss the First Amended Complaint.  *See* ECF No. 5.

P. 12(f).  "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters."  *McInerney v. Moyer Lumber & Hardware, Inc.*, 244. F. Supp. 2d 393, 402 (E.D. Pa. 2002) (citing *Garlanger v. Verbeke*, 223 F. Supp. 2d 596, 609 (D.N.J. 2002)).

Importantly, motions to strike are generally disfavored and granted sparingly, such as when a defense is clearly insufficient regardless of any disputed issues of fact.  *See Tonka Corp. v. Rose Art Indus., Inc.*, 836 F. Supp. 200, 217-18 (D.N.J. 1993).  "Motions to strike are decided on the pleadings alone."  *Deery v. Crystal Instr. Corp.*, No. 13-198, 2013 WL 4517867, at *1 (D.N.J. Aug. 26, 2013) (citations omitted).  "Even where the facts are not in dispute, Rule 12(f) is not meant to afford an opportunity to determine disputed and substantial questions of law."  *Tonka Corp.*, 836 F. Supp. at 218 (citing *Heller Fin. Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1295 (7th Cir. 1989)). The Court exercises wide discretion in considering a Rule 12(f) motion.  *Id.* at 217.

### B.   <u>Motion to Seal</u>

Requests to seal are governed by Local Civil Rule 5.3.  That rule requires a request to seal be presented by motion and that the motion papers must describe:

> (a) the nature of the materials or proceedings at issue; (b) the legitimate private or public interest which warrants the relief sought; (c) the clearly defined and serious injury that would result if the relief sought is not granted; (d) why a less restrictive alternative to the relief sought is not available; (e) any prior order sealing the same materials in the pending action; and (f) the identity of any party or nonparty known to be objecting to the sealing request.

L. Civ. R. 5.3(c)(3).

It is well established that there is a presumption of a "common law public right of access to judicial proceedings and records," *In re Cendant Corp.*, 260 F.3d 183, 192 (3d Cir. 2001), but "[i]n order to overcome this presumption," the movant must demonstrate that "'good cause' exists for the protection of the material at issue."  *Securimetrics, Inc. v. Iridian Techs., Inc.*, No. 03-4394, 2006

WL 827889, at *2 (D.N.J. Mar. 30, 2006). Good cause exists when a party makes a particularized showing that disclosure will cause a "clearly defined and serious injury to the party seeking closure." *Id.* (citing *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir. 1994)).

A court should grant a motion to seal when the movant proves that the information is confidential in nature, such that allowing the general public to access the information will cause a specific and serious injury. *Pansy*, 23 F.3d at 788. "Circumstances weighing against confidentiality exist" when (1) "confidentiality is being sought over information important to public health and safety"; (2) "when the sharing of information among litigants would promote fairness and efficiency"; (3) when "a party benefitting from the order of confidentiality is a public entity or official"; and (4) "when the judicial record involves matters of legitimate public concern." *LEAP Sys., Inc. v. MoneyTrax, Inc.*, 638 F.3d 216, 222-23 (3d Cir. 2011) (quoting *Pansy*, 23 F.3d at 787-78). Ultimately, the court has power to seal confidential information based on its inherent supervisory authority to deny public access to judicial records where those records might "become a vehicle for improper purposes." *In re Cendant*, 260 F.3d at 194.

## DISCUSSION

The Corporate Defendants contend that the First Amended Complaint contains allegations that disclose confidential attorney-client communications involving Plaintiff and Jerome Maddox, the General Counsel of FCCC. Specifically, the FAC makes the following allegations that are the subject of the present motion:

> 116. On April 11, 2023, Corporate Defendants' General Counsel, Jerome Maddox, emailed Plaintiff and Defendant Cook regarding the deal [with the Russian Company].

> 117. Defendant Maddox acknowledged that a U.S. company cannot transact business with a sanctioned Russian entity.

> 118. Plaintiff immediately responded that she had concerns she would like to share with Defendant Maddox that she had already

reported to Defendant Cook and asked to set up a call with Defendant Maddox to discuss.

. . . .

121.   On April 14, 2023, during the Teams call with Defendants Cook and Maddox, Plaintiff reiterated that she believed it was unethical for Corporate Defendants to negotiate/enter into a deal with a company she reasonably believed to be financed by a sanctioned Russian entity and a sanctioned Russian individual.

122.   The following day, in an effort to reiterate the fact that Plaintiff did not believe Defendants were properly investigating [the] Russian Company, Plaintiff wrote to Defendant Maddox suggesting he have law enforcement agencies check into [the] Russian Company before proceeding with the deal.

123.   Defendant Maddox did not respond to Plaintiff's email of April 15, 2023, but instead called Plaintiff on April 18, 2023. Defendant Maddox then told Plaintiff that Corporate Defendants would 'be okay with the PR" if the deal went forward.

FAC ¶¶ 116-118, 121-123.[3]

The following allegations from the original Complaint are also in dispute:

101.   On April 11, 2023, Corporate Defendants' General Counsel, Jerome Maddox emailed Plaintiff and Defendant Cook regarding the deal.

102.   Defendant Maddox himself indicated that to the extent Corporate Defendants would be working with a Russian entity, they would need to run sanctions checks, and further, that *if there was a sanctioned party involved*, they would not be able to complete the transaction.

103.   Plaintiff immediately responded that she had concerns she would like to share with Defendant Maddox that she had already reported to Defendant Cook and asked to set up a call with Defendant Maddox to discuss.

---

[3]   The Corporate Defendants' moving papers are unclear as to whether paragraphs 116 and 123 of the Amended Complaint are in dispute.  The table of contents and headings in the opening brief omit reference to these two paragraphs.  Corporate Defs.' Mot. i & 11.  The substance of the briefing and the Corporate Defendants' proposed order, however, claim that both paragraphs 116 and 123 are protected by the attorney-client privilege.  *Id.* at 8-11 & Proposed Order.  For purposes of comprehensiveness, the Court addresses these paragraphs.

> 104.    On April 14, 2023 during the Teams call with Defendants Cook and Maddox, Plaintiff reiterated her concerns with Corporate Defendants' plan to negotiate this deal as she reasonably believed the company to be financed by a sanctioned Russian entity.
>
> 105.    Defendant Maddox called Plaintiff on April 18, 2023, and told her that Corporate Defendants have a counsel who is looking into this matter and that if the institution decides to proceed with the proposed deal, Corporate Defendants would "be okay with the PR."

ECF No. 1-1 (Compl.), ¶¶ 101–105 (emphasis in original).

The questions now before the Court are (1) whether these communications between Plaintiff and Maddox are protected by the attorney-client privilege; and (2) if so, whether the Corporate Defendants are entitled to have these communications either stricken from the Complaint and FAC or sealed.

## A.  <u>Whether the Communications Are Protected by the Attorney-Client Privilege</u>

Rule 501 of the Federal Rules of Evidence directs this Court to look to state law in deciding questions of privilege when jurisdiction is based on diversity.  *See United Coal Cos. v. Powell Constr. Co.,* 839 F.2d 958, 965 (3d Cir. 1988).  In this case, the attorney-client privilege is governed by New Jersey law.  Like federal courts, state courts recognize the same policies behind the privilege.  "The privilege exists to promote full and frank discussions between attorneys and their clients." *Leonen v. Johns-Manville*, 135 F.R.D. 94, 98 (D.N.J. 1990) (citing *United Jersey Bank v. Wolosoff,* 196 N.J. Super. 553 (App. Div. 1984)); *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981)).  Because the privilege "obstructs the truth-finding process, it is construed narrowly." *Westinghouse Elec. Corp. v. Republic of Philippines*, 951 F.2d 1414, 1423 (3d Cir. 1991) (citations omitted).

In the case of corporations, the United States Supreme Court has recognized that communications between in-house counsel and top management and in certain cases, communications between in-house counsel and lower-level employees are covered by the attorney client privilege.  *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985) (citing *Upjohn*, 449 U.S. at 389); *see also Travelers Prop. Cas. Co. of Am. v. USA Container Co., Inc.*, No. 09-1612, 2012 WL 12898823, at *20 (D.N.J. Oct. 25, 2012) (noting that "the attorney-client privilege applies to communications between a corporation's employee and its in-house counsel for purposes of legal advice").

While the privilege protects attorney-client communications, the facts underlying the communication are not subject to any protection.  *See Upjohn*, 449 U.S. at 395 ("[P]rotection of the privilege extends only to *communications* and not to facts." (emphasis in original) (quoting *Philadelphia v. Westinghouse Elec. Corp.* 205 F. Supp 830, 831 (E.D. Pa. 1962))); *see also In re Samsung Customer Data Sec. Breach Litig.*, No. 23-3055, 2024 WL 3861330, at *4 (D.N.J. Aug. 19, 2024) (observing that facts underlying attorney-client communications are not privileged).  "The party invoking the attorney[-]client privilege bears the burden of proving the privilege applies and must show:  (1) that it submitted confidential information to a lawyer, and (2) that it did so with the reasonable belief that the lawyer was acting as the party's attorney, . . . and (3) that the purpose of the communications was to secure legal, as opposed to business, advice."  *In re Samsung*, 2024 WL 3861330, at *4 (cleaned up).

Relevant here, under the third factor, "while legal advice given to a client by an attorney is protected by the privilege, business advice generally is not."  *La. Mun. Police Emps. Ret. Sys. v. Sealed Air Corp.*, 253 F.R.D. 300, 305 (D.N.J. 2008) (quotation omitted); *see also Wachtel v. Health Net, Inc.*, 482 F.3d 225, 231 (3d Cir. 2007) ("Where a lawyer provides non-legal business advice, the communication is not privileged." (citations omitted)).  Although business and legal advice is

often inextricably interwoven, "[a]dvice that is predominantly concerned with corporate business, technical issues, or public relations, it is not protected." *United States v. Coburn*, No. 19-120, 2022 WL 357217, at *3 (D.N.J. Feb. 1, 2022) (citation omitted); *see also Dejewski v. Nat'l Beverage Corp.*, No. 19-14532, 2021 WL 118929, at *1-2 (D.N.J. Jan. 12. 2021). "When a corporate claims privilege over communication with in-house counsel, they 'must clearly demonstrate that the communication in question was made for the express purpose of securing legal not business advice.'" *Casey v. Unitek Glob. Servs., Inc.*, No. 14-2671, 2015 WL 539623, at *4 (E.D. Pa. Feb. 9, 2015) (quoting *AAMCO Transmissions, Inc. v. Marino*, No. 88-5522, 1991 WL 193502, at *3 (E.D. Pa. Sept. 24, 1991); *see also Leonen*, 135 F.R.D. at 99.

With these standards in mind, the Court considers the individual allegations challenged by Defendants.

### 1. Paragraphs 101 of the Complaint and 116 of the FAC

Paragraphs 101 of the Complaint and 116 of the FAC make the identical allegation:

> On April 11, 2023, Corporate Defendants' General Counsel, Jerome Maddox emailed Plaintiff and Defendant Cook regarding the deal [with the Russian Corporation].

Compl. ¶ 101; FAC ¶ 116.

As noted above, the attorney-client privilege does not protect a party from disclosing underlying facts. Rather, it simply protects communications between a party and the party's attorney. *Samsung*, 2024 WL 3861330, at *4. Paragraphs 101 of the Complaint and 116 of the First Amended Complaint disclose no such communications. These paragraphs set forth the fact that Maddox emailed Plaintiff and Cook regarding the deal without revealing the substance of that information. The Court finds that this paragraph is not protected by the attorney-client privilege.

2. <u>Paragraphs 102 of the Complaint and 117 of the FAC</u>

Paragraphs 102 of the Complaint and 117 of the FAC allege similar information but differ slightly in their wording:

> Defendant Maddox himself indicated that to the extent Corporate Defendants would be working with a Russian entity, they would need to run sanctions checks, and further, that ***if there was a sanctioned party involved***, they would not be able to complete the transaction.

Compl. ¶ 102 (emphasis in original).

> Defendant Maddox acknowledged that a U.S. company cannot transact business with a sanctioned Russian entity.

FAC ¶ 117.

Plaintiff contends that Maddox's statements in response to her "whistleblowing activity" are not legal advice to a client. Plaintiff claims that she spoke to Maddox to blow the whistle on what she believed was illegal and unethical conduct being committed by others, conducted her own research on the Russian Company, and was not a decision-maker for the Corporate Defendants on whether to consummate the deal or even pursue further discussions with the Russian Company. Thus, Plaintiff asserts that because she was not seeking legal advice, Maddox's unsolicited recitation of the law could not be construed as giving legal advice and Maddox could not possibly have had any expectation that he was communicating privileged information.

The Court disagrees. "[I]f the communication sought to be elicited relates to [a corporate employee's] conduct or knowledge *during* her employment with [the corporate defendant], or if concerns conversations with corporate counsel that occurred *during* her employment, the communication is privileged." *U.S. ex rel. Hunt v. Merck-Medco Managed Care, LLC*, 340 F. Supp. 2d 554, 558 (E.D. Pa. 2004) (emphasis in original); *see also Upjohn*, 449 U.S. 394-95 (holding that a corporation's attorneys' conversations with current corporate employees could be covered by the

14

attorney-client privilege).  In an analogous case from this District, *Jewitt v. IDT Corp.*, No. 04-1454, 2004 WL 7321367, at *4 (D.N.J. Aug. 9, 2004), the plaintiff, as a corporate employee, asked the corporation's counsel for legal advice regarding a proposed transaction.  *Id.* at *4.  After his termination, he, like Plaintiff here, brought a claim under NJLAD.  *Id.*  The court found that "[t]o allow Plaintiff to disclose the legal advice would vitiate the attorney-client privilege in a corporate context." *Id.*  Accordingly, the court ordered those portions of the complaint sealed.  *Id.*

Here, the allegations disclose confidential communications between the Corporate Defendants' employee (Plaintiff) and in-house counsel (Maddox); therefore, they are protected by the privilege.  Plaintiff was assigned to work on this project.  By her own admission, Plaintiff believed that any deal between the Corporate Defendants and the Russian Company would be in direct violation of President Biden's Executive Orders involving Russia-related sanctions and could result in the Corporate Defendants' legal liability.  FAC ¶¶ 111, 113.  As such, she told Maddox that she had "concerns," suggesting that her concerns were legal in nature.  *Id.* ¶ 118.  Maddox's response—set forth in paragraph 117 of the FAC and paragraph 102 of Complaint—that the Corporate Defendants could not legally transact business with a sanctioned entity, constituted legal advice from the corporation's counsel to a corporate employee regarding a proposed transaction with which she was involved.  There is no basis in the record for Plaintiff's argument that she sought legal advice in a personal role due to her concerns about the impact of her involvement in this project on her career.  Accordingly, these paragraphs are covered by the attorney-client privilege.

3.  Paragraphs 103 of the Complaint and 118 of the Amended Complaint

Paragraphs 103 of the Complaint and 118 of the FAC make the identical allegation:

> Plaintiff immediately responded that she had concerns she would like to share with Defendant Maddox that she had already reported to Defendant Cook and asked to set up a call with Defendant Maddox to discuss.

Compl. ¶ 103; FAC ¶ 118.

Again, this allegation is nothing more than a recitation of the underlying facts and does not disclose the substance of any privileged communications. As such, it is not covered by the attorney-client privilege.

### 4. Paragraphs 104 of the Complaint and 121 of the FAC

Paragraphs 104 of the Complaint and 121 of the FAC similarly allege:

> 104. On April 14, 2023 during the Teams call with Defendants Cook and Maddox, Plaintiff reiterated her concerns with Corporate Defendants' plan to negotiate this deal as she reasonably believed the company to be financed by a sanctioned Russian entity.

Compl. ¶ 104.

> 121. On April 14, 2023, during the Teams call with Defendants Cook and Maddox, Plaintiff reiterated that she believed it was unethical for Corporate Defendants to negotiate/enter into a deal with a company she reasonably believed to be financed by a sanctioned Russian entity and a sanctioned Russian individual.

FAC ¶ 121.

The clear import of these paragraphs is that Plaintiff was expressing an *ethical* concern with the Corporate Defendants' potential involvement with the Russian Company. She was not seeking legal advice or consultation from Maddox in his role as in-house counsel. Such allegations are not covered by the attorney-client privilege.

### 5. Paragraph 122 of the FAC

Paragraph 122 of the FAC, which has no correlative paragraph in the Complaint, states:

> The following day, in an effort to reiterate the fact that Plaintiff did not believe Defendants were properly investigating [the] Russian Company, Plaintiff wrote to Defendant Maddox suggesting he have law enforcement agencies check into [the] Russian Company before proceeding with the deal.

FAC ¶ 122.

Nothing in this paragraph discloses any confidential attorney-client communications. Rather, as the Corporate Defendants admit, these communications simply describe "efforts by Plaintiff to consult with FCCC's General Counsel about the legal implications of the proposed deal for the organization," not the actual communications substantively addressing the legal concerns at issue.  Defs.' Motion at 10.

### 6.  Paragraph 105 of the Complaint and 123 of the FAC

Paragraphs 105 of the Complaint and 123 of the FAC state:

> 105.    Defendant Maddox called Plaintiff on April 18, 2023, and told her that Corporate Defendants have a counsel who is looking into this matter and that if the institution decides to proceed with the proposed deal, Corporate Defendants would "be okay with the PR."

Compl. ¶ 105.

> 123.    Defendant Maddox did not respond to Plaintiff's email of April 15, 2023, but instead called Plaintiff on April 18, 2023. Defendant Maddox then told Plaintiff that Corporate Defendants would "be okay with the PR" if the deal went forward.

FAC ¶ 123.

While these paragraphs disclose communications, the Corporate Defendants have not met their burden of proving that these communications are legal in nature.  "[W]here a communication contains both legal and business advice, the attorney-client privilege will apply only if the primary purpose of the communication was to aid in the provision of legal advice."  *Claude P. Bamberger Int'l, Inc. v. Rohm & Haas Co.*, No. 96-1041, 1997 WL 33768546, at *2 (D.N.J. Aug. 12, 1997) (citation omitted), *aff'd*, 1997 WL 33762249 (D.N.J. Dec. 29, 1997).  "A company's 'decision on how to market or advertise a product, or what conditions of sale should apply' is not privileged because '[a]though it is based on legal advice, [the communication] is primarily a business policy.'" *Fed. Trade Comm'n v. Abbvie*, No. 14-5151, 2015 WL 8623076, at *3 (E.D. Pa. Dec. 14, 2015) (quoting *In re Domestic Drywall Antitrust Regul.*, No. 13-2437, 2014 WL 5090032, at *4 (E.D. Pa.

Oct. 9, 2014)); *see also In re Riddell Concussion Reduction Litig.*, No. 13-7585, 2016 WL 7108455, at *9 (D.N.J. Dec. 5, 2016) (finding that disputed documents related to public relations and messaging rather than legal advice, opinions, or issues  not covered by the attorney-client privilege protection because a media campaign is not a litigation strategy even if an attorney deems it advisable).

The allegations at issue here do not appear to involve legal advice.  Rather, Maddox told Plaintiff that other counsel were looking into the legality of the matter, and if the Corporate Defendants chose to proceed with the deal, they would "be okay with the [public relations]."  Such a statement is purely business in nature and communicates corporate, not legal, strategy.  Therefore, the Court finds that the attorney-client privilege does not shield these paragraphs.[4]

### B.    Whether the Paragraphs Covered by the Attorney-Client Privilege Should Be Stricken or Sealed

The remaining inquiry is what action, if anything, should the Court take with respect to the two paragraphs that divulge attorney-client privileged information.  The Corporate Defendants seek to have these paragraphs stricken pursuant to Rule 12(f) or alternatively, sealed or redacted.

As noted above, while Rule 12(f) permits a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter," such motions are generally disfavored and granted sparingly. *Tonka Corp.*, 836 F. Supp. at 217-18.

Mindful of this admonition, the Court declines to strike paragraph 102 of the Complaint or paragraph 117 of the FAC.  Although the communications disclosed in these paragraphs have

---

[4]  Plaintiff argues that the Corporate Defendants waived the attorney-client privilege when they failed to act with reasonable diligence to preserve the alleged confidential nature of the communications.  Pl.'s Opp'n 26.  The Court is not persuaded.  The Corporate Defendants promptly asserted the privilege one week after Plaintiff filed her original Complaint. *See* ECF No. 1-1. Thereafter, when removing the matter to federal court, the Corporate Defendants were required to file the unredacted FAC with their pleadings.  *See* 28 U.S.C. § 1446(a).  Within weeks of the removal, the Corporate Defendants filed this motion.

attorney-client privilege protection, their inclusion in the pleadings is not redundant, immaterial, impertinent, or scandalous.  Indeed, the allegations appear relevant to Plaintiff's claim that she was terminated  due to her alleged "whistleblowing" activity.  Moreover, the Corporate Defendants have not articulated any undue prejudice or harm from the continued inclusion of these paragraphs.[5]

Nonetheless, the Court finds adequate justification to redact these portions of the Complaint and FAC and have them sealed.  As noted above, under Local Civil Rule 5.3, the court must consider

> (a) the nature of the materials or proceedings at issue; (b) the legitimate private or public interest which warrants the relief sought; (c) the clearly defined and serious injury that would result if the relief sought is not granted; [and] (d) why a less restrictive alternative to the relief sought is not available.

L. Civ. R. 5.3(c)(2).

The first factor rests on whether the materials involve "matters of legitimate public concern." *Pansy*, 23 F.3d at 788.  Where the materials are of particular public interest, this factor weighs against confidentiality; where the materials are truly private in nature, this factor weights in favor of confidentiality.  *Id.* at 788; *LEAP Sys., Inc.*, 638 F.3d at 222.  A party's "asserted privacy interest in maintaining the confidentiality of attorney-client communications is legitimate."  *At Home Sleep Sols., LLC v. Horizon Healthcare Servs. of N.J.*, No. 18-3333, 2023 WL 4579710, at *2 (D.N.J. 2023) (citation omitted); *see also Rudderow v. Boston Sci. Corp.*, No. 20-8561, 2022 WL 1500958, at *6 (D.N.J. May 12, 2022).  Given that Plaintiff has not identified, and this Court cannot discern, any particular public interest in the paragraphs at issue, this factor weighs in favor of sealing.

The second factor weighs the legitimate private interests against the public's general interest in disclosure.  *At Home Sleep Solutions*, 2023 WL 4579710, at *2.  "Courts have recognized the

---

[5]  The Corporate Defendants have cited several out-of-circuit cases where the court struck privileged information in pleadings.  These cases are not persuasive here as the holdings of those cases were fact-specific.

protection of attorney-client information as a legitimate private interest and that the disclosure of such information could create unreasonable pain." *Id.; see also Emmanouil v. Roggio*, No. 06-1068, 2009 WL 961275 (D.N.J. Apr. 7, 2009) ("Courts have long recognized the attorney-client privilege as one of the few exceptions to the public's right to 'every man's evidence.'" (quoting *Wachtel v. Health net, Inc.*, 482 F. 3d 225, 230-31 (3d Cir. 2007)). Absent any legitimate public interest in these private communications, this factor weighs in favor of sealing.

The third factor requires the party seeking to seal to describe a clearly defined and serious injury, providing more than "[b]road allegations of harm, unsubstantiated by specific examples or articulated reasoning." *Pansy*, 23 F.3d at 786 (quotations omitted). Disclosure of privileged material may constitute such harm where a failure to seal will destroy the privilege of attorney-client communications. *Rudderow*, 2022 WL 1500958, at *6. Here, injury to the Corporate Defendants could result from the public having access to Maddox's analysis, in his capacity as corporate counsel, of the legality of the Corporate Defendants' intended transaction with the Russian Company. Therefore, this factor favors sealing.

Finally, there are no less restrictive alternative means than redaction of these two paragraphs. This narrowly-crafted solution appropriately balances the need to protect the parties' interests with the presumption in favor of public accessibility.

Therefore, the Court finds good cause to redact paragraph 102 in the Complaint and paragraph 117 in the FAC.

## CONCLUSION

For the foregoing reasons, the Court deems paragraph 102 of the Complaint and paragraph 117 of the First Amended Complaint to be protected by the attorney-client privilege but declines to find that the other identified paragraphs are entitled to the same protection. The Court's consideration of the *Pansy* factors counsels in favor of redacting these paragraphs from public view.

Accordingly, the Corporate Defendants' motion to strike and seal will be **GRANTED IN PART and DENIED IN PART**.  An appropriate Order follows.


s/Elizabeth A. Pascal
ELIZABETH A. PASCAL
United States Magistrate Judge


cc:  Hon. Edward S. Kiel, U.S.D.J.