# EXHIBIT A

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| INNA KHARTCHENKO,<br><br>          *Plaintiff,*<br><br>   vs.<br><br>THE AMERICAN ONCOLOGIC HOSPITAL, INC., THE FOX CHASE CANCER CENTER, TEMPLE UNIVERSITY HEALTH SYSTEM, INC., SANGEETA BARDHAN COOK, JOHN LASKY, AMBER MEDLIN, JEROME MADDOX, ABC CORPORATIONS 1-5 (fictitious names describing presently unidentified business entities); and JOHN DOES 1-5 (fictitious names of unidentified individuals),<br><br>          *Defendants.* | No. 1:23-cv-23043-ESK-EAP<br><br><br><br>**SECOND AMENDED COMPLAINT & DEMAND FOR TRIAL BY JURY** |

Plaintiff Inna Khartchenko ("Plaintiff"), by way of complaint against Defendant The American Oncologic Hospital ("Defendant AOH"), Defendant The Fox Chase Cancer Center ("Defendant FCCC"), Defendant Temple University Health System, Inc. ("Defendant TUHS") (collectively "Corporate Defendants"), Defendant Sangeeta Bardhan Cook ("Defendant Cook"), Defendant John Lasky ("Defendant Lasky"), Defendant Amber Medlin ("Defendant Medlin"), and Defendant Jerome Maddox ("Defendant Maddox") (collectively "Individual Defendants" and together with Corporate Defendants, "Defendants"), alleges as follows:

## **INTRODUCTION**

This action arises out of the unlawful termination of a dedicated, experienced, conscientious, and loyal employee. Plaintiff, Corporate Defendants' Director of Technology Transfer and New Ventures, was nothing short of an exemplary employee, which is reflected by her positive performance reviews, raises, and promotions throughout her multi-decade career with Corporate Defendants. That all changed, however, when Plaintiff invoked her disability-leave rights and objected to the unlawful and discriminatory activity of her supervisors.

As discussed more fully below, in response to Plaintiff's good-faith complaints, Defendants buried their heads in the sand, intentionally made Plaintiff's working conditions more difficult, ostracized Plaintiff from her co-workers, stripped Plaintiff of significant job responsibilities and important presentations, humiliated her by assigning her trivial tasks well beneath her experience, initiated a flawed internal investigation, and subjected her to a sham performance improvement plan designed to cover up Defendants' retaliatory motive. The retaliation culminated in Defendant Cook's termination of Plaintiff, which after decades of dedicated work, took all of one minute over Teams while Plaintiff worked from her home in New Jersey. The "meeting" lacked substance or justification and occurred on the very next day her performance improvement plan came due (though the decision had already been made).

2

In short, Defendants unlawfully terminated Plaintiff's employment in a thinly veiled attempt to silence her once and for all. But Plaintiff will not be silenced. She brings this lawsuit to not only recover all the damages and remedies available under the New Jersey Conscientious Employee Protection Act N.J.S.A. 34:19-1 et seq. ("CEPA"); the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 et seq. ("NJLAD"); the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq ("ADA"); the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("CRA"); the Pennsylvania Human Relations Act, 43 P.S. §§ 951-63 ("PHRA"); and the Pennsylvania Whistleblower Law, 43 P.S. §§ 1423 et seq. ("PWL"), but to fully expose Defendants' unlawful and retaliatory conduct.

## **PARTIES**

1.      Plaintiff is an individual residing in Princeton Junction, New Jersey. At all times relevant hereto, Plaintiff was employed by Corporate Defendants as the Director of Technology Transfer and New Ventures.

2.      Defendant AOH is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a main business address of 3509 North Broad Street, Room 936, Philadelphia, Pennsylvania 19140. Defendant AOH has a registered agent located at 1 Main Street, Suite 416, Eatontown, New Jersey 07724. Defendant AOH is a single and/or joint "employer" as defined under the NJLAD, CEPA, ADA, CRA, PHRA, and PWL.

3.    Defendant FCCC is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a main business address of 333 Cotman Avenue, Philadelphia, Pennsylvania 19111. Defendant FCCC has locations in Philadelphia, East Norriton, Furlong, Doylestown, and Rockledge, Pennsylvania, and Voorhees, New Jersey.  Defendant FCCC is a single and/or joint "employer" as defined under the NJLAD, CEPA, ADA, CRA, PHRA, and PWL.

4.    Defendant TUHS is a nonprofit corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a main business address of 3509 North Broad Street, 9th Floor, Philadelphia, Pennsylvania 1940. Defendant TUHS is a single and/or joint "employer" as defined under the NJLAD, CEPA, ADA, CRA, PHRA, and PWL.

5.    At all relevant times, Corporate Defendants are Plaintiffs' joint employers under New Jersey, Pennsylvania, and Federal law. Corporate Defendants had the power to hire and fire Plaintiff and control Plaintiff terms and conditions of employment. Corporate Defendants are therefore jointly and vicariously liable for Plaintiffs' claims.

6.    In this regard, upon information and belief, their operations are interrelated and unified, and they share common management, centralized control of labor relations, common ownership, common control, common website, common

business purposes, common practices, and decisions with respect to policies and/or interrelated business goals.

7.    Defendant Cook, is at all times relevant hereto, employed by Corporate Defendants as the Chief Innovation Officer for FCCC and Senior Vice President of Commercialization Strategy and Business Development for TUHS. This claim is brought against Defendant Cook in her individual capacity and/or as an agent, servant, representative, and/or employee of Corporate Defendants during the course of her employment.

8.    Defendant Lasky, is at all times relevant hereto, employed by Corporate Defendants as Executive Vice President and the Chief Human Resources Officer. This claim is brought against Defendant Lasky in his individual capacity and/or as an agent, servant, representative, and/or employee of Corporate Defendants during the course of his employment.

9.    Defendant Medlin, is at all times relevant hereto, employed by Corporate Defendants as a Senior Human Resources Business Partner. This claim is brought against Defendant Medlin in her individual capacity and/or as an agent, servant, representative, and/or employee of Corporate Defendants during the course of her employment.

10.    Defendant Maddox, is at all times relevant hereto, employed by Corporate Defendants as General Counsel for FCCC. This claim is brought against

Defendant Maddox in his individual capacity and/or as an agent, servant, representative, and/or employee of Corporate Defendants during the course of his employment.

11. Defendant ABC Corporations 1 through 5 are currently unidentified business entities who have acted in concert with Corporate Defendants, and/or currently unidentified business entities responsible for the creation and/or implementation of anti-discrimination policies of Corporate Defendants, and/or currently unidentified business entities who have liability for the damages suffered by Plaintiff under any theory advanced herein.

12. Defendants John Does 1 through 5 are currently unidentified individuals who acted in concert with Defendants and/or currently unidentified individuals responsible for the creation and/or implementation of anti-retaliation and/ or anti-discrimination policies of Corporate Defendants and are currently unidentified individuals who may have liability for the damages suffered by Plaintiff under any theory advanced herein.

## **JURISDICTION AND VENUE**

13. Plaintiff filed her Complaint in the Superior Court of New Jersey, Law Division, Mercer County, at Docket No. MER-L-001311-23.

14. Defendants removed the matter to this Court on the basis of diversity jurisdiction. 28 U.S.C. § 1332(a)(2).

15.     Plaintiff seeks recovery of compensatory damages, punitive damages, attorneys' fees, costs, and other legal and equitable relief, but has not specifically enumerated the amount in controversy in the First Amend Complaint. The entire amount in controversy exceeds the sum or value of $75,000.

16.     Pursuant to 28 U.S.C. §§ 1441(a), venue is proper in the United States District Court for the District of New Jersey, because the facts and circumstances occurred in this district and the matter was removed from Mercer County.

17.     This Court has personal jurisdiction because the transactions and occurrences that give rise to this lawsuit took place in New Jersey while Plaintiff was at her home and her home office.

18.     The Court assigned this case to the Camden Vicinage on March 28, 2024.

19.     On March 27, 2024, Plaintiff filed three Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Pennsylvania Human Relations Commission ("PHRC") against the Corporate Defendants.

20.     On November 21, 2024, the EEOC issued Plaintiff a Notice of Right to Sue for her Charges of Discrimination against each of the Corporate Defendants.

## FACTS COMMON TO ALL CLAIMS

21.     Plaintiff incorporates each and every allegation set forth above as if

repeated fully herein at length.

22.    Defendant AOH was one of the nation's first cancer hospitals established in 1904.

23.    Defendant AOH, in union with the Institute for Cancer Research, formed Defendant FCCC in 1974, expanding the hospital's range of research.

24.    In 2012, Defendant FCCC became part of Defendant TUHS.

25.    Since then, Corporate Defendants have operated together as joint entities.

26.    Corporate Defendants service patients from across the world in neighborhoods throughout the Greater Philadelphia region and South Jersey.

27.    Approximately 20% of Corporate Defendants' patients are New Jersey residents, and, as of March 2024, Defendant FCCC has opened a location in Voorhees, New Jersey, where they are equipped to treat a wide range of patients.[1]

28.    Corporate Defendants permanently expanded their operations into New Jersey to "reinforce Fox Chase's commitment to providing top-tier cancer care to the South Jersey community."[2]

29.    Indeed, Corporate Defendants have longstanding contacts with New Jersey as they partner with New Jersey based hospitals to provide services to their

---

[1] *See* https://www.foxchase.org/news/2024-03-28-fox-chase-cancer-center-opens-first-new-jersey-location-in-voorhees.

[2] https://www.burlingtoncountytimes.com/story/sponsor-story/fox-chase-cancer-center/2024/05/01/breaking-ground-in-cancer-care-fox-chase-opens-voorhees-location/73498619007/.

New Jersey patients.[3]

30.     Upon information and belief, Corporate Defendants receive Medicaid funding through the federal and state governments. Indeed, approximately 45% of Corporate Defendants' patients are covered by Medicaid, and 87% of Corporate Defendants' discharges are Medicaid and Medicare patients.[4]

31.     Furthermore, upon information and belief, Corporate Defendants receive substantial additional funding from the Commonwealth of Pennsylvania and from the federal government.[5]

32.     Plaintiff is an immigrant of Russian and Ukrainian origin, who holds both a Master of Science in Biochemistry and Molecular Biology and a Master of Business Administration.

33.     Plaintiff has nearly 34 years of experience working in Research & Development and Technology Transfer.

34.     Plaintiff dedicated more than 25 years of her career working for Temple University and its related entities.

35.     Plaintiff commenced employment with Temple University in or about 1997 in the Office of Technology Transfer.

---

[3] https://www.foxchase.org/about-partners-program *and* https://www.foxchase.org/patients/partners-program/find-partner-hospital/hunterdon-healthcare.
[4] https://www.aha.org/case-studies/2022-11-29-temple-university-hospital-pennsylvania.
[5] *See* https://www.foxchase.org/news/2023-05-11-fox-chase-cancer-center-temple-health-thank-state-representative-kevin-boyle-and-state-senators-jimmy-dillon-and-christine-tartaglione-for-securing-15-million-in-funding, *and* https://boyle.house.gov/media-center/press-releases/congressman-boyle-announces-federal-funding-fox-chase-cancer-center-0.

36.     In 2007, Plaintiff transitioned from Temple University to Corporate Defendants where she became the Director of Licensing and Associate Director of Business Development (Office of Business Development was later transformed into the Office of Research and Development Alliances).

37.     Plaintiff was promoted to the Director of Technology Transfer in 2015.

38.     In 2018, Plaintiff's responsibilities were expanded to include New Ventures program as well.

39.     Throughout much of Plaintiff's employment, and at all times relevant hereto, she worked remotely from her home office in New Jersey.

40.     Plaintiff was expected to conduct her regular duties and maintain her productivity from her home office in New Jersey, while also paying New Jersey income taxes.

41.     In fact, throughout Plaintiff's employment, she conducted business in New Jersey on behalf of Corporate Defendants working in New Jersey on numerous projects with New Jersey–based entities, including but not limited to Princeton University, Rutgers University, I-Corps Northeast, BioNJ, New Jersey Technology Council, Bristol Myers Squibb, Daiichi Sankyo, and other biotech companies and life science organizations.[6]

42.     In addition, Plaintiff worked extensively with Genesis Drug Discovery

---

[6] *See* https://icorpsnortheasthub.org/explore/regional-program, *and* https://bionj.org/.

& Development, a New Jersey–based biotechnology company.

43.     Genesis Drug Discovery & Development purchased a controlling interest in NexusPharma, a startup company in which Fox Chase Cancer Center held equity.[7]

44.     During and following the acquisition of NexusPharma by Genesis Drug Discovery & Development, Plaintiff spent as much as 50% of her time performing due diligence and negotiating various agreements on behalf of Corporate Defendants related to that New Jersey company.

45.     Throughout her employment, Plaintiff was encouraged to attend events and meetings in New Jersey with companies that Corporate Defendants contracted and were affiliated with in order to effectuate her job responsibilities.

46.     At all times relevant hereto, Plaintiff exceeded expectations in her positions with Corporate Defendants as evidenced not only by her lengthy employment tenure, but also by her favorable performance reviews throughout the years.

47.     Plaintiff's employment was without issue until she (i) complained of inappropriate, discriminatory comments made by Defendant Cook, Plaintiff's direct supervisor and Corporate Defendant's Chief Innovation Officer, (ii) subsequently reported Defendant Cook for retaliating against her by way of attempting to deny

---

[7] https://nexus.nexuspharm.com/about/.

her a necessary medical accommodation for her disability, and (iii) objected to Defendants' unlawful business dealings with a Russian company financed by a sanctioned fund. Defendants ultimately unlawfully terminated Plaintiff's employment in direct retaliation for the same. New Jersey enacted CEPA because of the State's strong public policy to protect whistleblowers from retaliation. "[I]t is beyond dispute that the legislative purpose animating CEPA is . . . 'to protect and encourage employees to report illegal or unethical workplace activities and to discourage . . . employers from engaging in such conduct.'" *Lippman v. Ethicon, Inc.*, 222 N.J. 362, 378, 119 A.3d 215 (N.J. 2015) (quoting *Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 N.J. 405, 431, 650 A.2d 958 (N.J. 1994)).

48.     Defendants decided to terminate Plaintiff while she was in New Jersey in retaliation for reports made by Plaintiff from her home office in New Jersey. Thus, Plaintiff's injury – her termination – occurred in New Jersey. *Calabotta v. Phibro Animal Health Corp.*, 460 N.J. Super. 38, 56, 213 A.3d 210 (N.J. Super. Ct. App. Div. 2019) (citing *Restatement (Second) of Conflicts of Laws*, § 146 (Am. Law Inst. 1971) ("Second Restatement")).

49.     It is clear that New Jersey has a greater policy interest than Pennsylvania in this retaliation action because Plaintiff was a New Jersey citizen who suffered her injury in New Jersey after she used sick time to recover at home after having a serious surgery and emailed Defendants her internal complaint from

her home in New Jersey and because she was subject to Defendants' unlawful termination while in her home in New Jersey in retaliation of her complaints after years of dedicated service to Corporate Defendants' from her home in New Jersey. Second Restatement § 6(2)(b)-(c).

50.     The NJLAD is remedial social legislation.  Its "overarching goal is to eradicate the []cancer of discrimination," and, as such, the statute "should be liberally construed." *Nini v. Mercer Cnty. Cmty. Coll.*, 202 N.J. 98, 108-09, 995 A.2d 1094 (N.J. 2010) (citations omitted).  The Legislature has specifically provided that practices of unlawful discrimination "are matters of concern to the government of the State," and that "such ***discrimination threatens not only the rights and proper privileges of the inhabitants of the State*** but menaces the institutions and foundations of a free democratic State."  N.J.S.A. 10:5-3 (emphasis added).

51.     Plaintiff was a citizen of New Jersey who disclosed, objected to, and reported her direct supervisors for engaging in discriminatory and retaliatory conduct.  Plaintiff voiced her objections to Defendants in an email to Corporate Defendant's Human Resources Department while Plaintiff was home in New Jersey. In the swiftest and clearest of retaliation, Defendants terminated Plaintiff during a Microsoft Teams meeting that she conducted from her office in New Jersey.

52.     New Jersey law specifically aims to prevent this discriminatory and retaliatory conduct, causing New Jersey to have a greater state interest in its law

being applied to this matter.

53.     Regardless, the laws of the Commonwealth of Pennsylvania and the United States provide redress for Plaintiff's unlawful termination as well.

### Defendant Cook's Retaliation Against Plaintiff for Reporting and Objecting to Defendant Cook's Pattern of Discriminatory Conduct

54.     Defendant Cook commenced employment with Corporate Defendants in August 2022.

55.     Defendant Cook was hired as the Chief Innovation Officer for FCCC and Senior Vice President of Commercialization Strategy and Business Development for TUHS, and she also was Plaintiff's direct supervisor.

56.     Unfortunately, by October 2022, Defendant Cook's discriminatory animus became readily apparent.

57.     Specifically, on October 27, 2022, Defendant Cook sent a message to Plaintiff on Microsoft Teams about Corporate Defendants' President and Chief Executive Officer, Robert Uzzo ("Mr. Uzzo"), and Corporate Defendants' Cancer Center Director, Jonathan Chernoff ("Mr. Chernoff").

58.     Defendant Cook remarked that Mr. Uzzo and Mr. Chernoff were "two white guys" who only cared about samples from underrepresented patient populations because the National Cancer Institute "forced them" to care.



59.     Plaintiff was shocked to read such negative, unfounded, and discriminatory remarks about Mr. Uzzo and Mr. Chernoff who Defendant Cook had only worked with for three months.

60.     However, Plaintiff feared that objecting to Defendant Cook's comments to her directly would lead Plaintiff to be Defendant Cook's next target.

61.     Plaintiff hoped that Defendant Cook's comments would stop there, but Defendant Cook's comments only became more egregious.

62.     Indeed, over the next several months, Defendant Cook made additional

inappropriate comments about Corporate Defendants' investigators and senior administration.

63.    For example, during a one-on-one meeting in December 2022, Defendant Cook brought up Corporate Defendants' Professor, Edna (Eti) Cukierman ("Ms. Cukierman"), and specifically asked Plaintiff, "***Do you know which PI is the biggest manipulator? It is Eti [Ms. Cukierman]. She can play people in such a way that they would not even notice. When I was listening to her at some meetings, I thought that my ex Jewish boyfriends would behave in exactly the same way.***"

64.    It was clear that Defendant Cook was insinuating that Ms. Cukierman was manipulative due to her Jewish heritage.

65.    On another occasion, Defendant Cook commented, "***Israelis are the worst to negotiate with***."

66.    Plaintiff was astonished that Defendant Cook would make blatant antisemitic comments so freely during work meetings in 21st century America.

67.    Plaintiff objected to Defendant Cook's comments by explaining that many of her friends are Jewish and that she grew up surrounded by Jewish students and teachers when she was a student at a specialized physics and math high school in St. Peterburg, Russia.

68.    Plaintiff was especially offended by Defendant Cook's antisemitism as Plaintiff's grandmother's parents and young siblings sadly lost their lives in the

Holocaust.

69.    Beyond Defendant Cook's antisemitic comments, Defendant Cook regularly made harassing comments about many of Plaintiff's colleagues.

70.    For instance, Defendant Cook mocked the voice of Corporate Defendants' Director of Sarcoma Oncology, Margaret Con Mehren, and called Corporate Defendants' Assistant Vice-President of Communications, Jeremy Moore, a "rat." Defendant Cook even went as far as to call Corporate Defendants' professor, Dr. Jonathan Whetstine, "dangerous."

71.    Defendant Cook also complained to Plaintiff that Corporate Defendants' Vice President of Research, John Gricoski ("Mr. Gricoski"), questioned Defendant Cook's authority during one of their meetings in response to Defendant Cook's requests for information from his department, and Defendant Cook said to Plaintiff: "***Who is [Mr. Gricoski] to question my authority? I am the one who reports to Mike Young [the CEO of TUHS]***."

72.    Plaintiff was shocked to hear such disrespectful and unprofessional remarks about FCCC's administration from her supervisor as Plaintiff worked with these people for 15 years and treated her colleagues with respect.

73.    Defendant Cook also said that she did not push Mr. Gicoski too much because he was sick and in pain. This was yet another instance of Defendant Cook improperly disclosing personal and confidential information pertaining to Plaintiff's

colleagues. Defendant Cook then proceeded to say that when people are in pain, it gets reflected in their communication style at work. Defendant Cook even gave an example of one of her former bosses at the City of Hope who frequently had problems with his kidneys and "lashed out on her" whenever he was in pain.

74.    It was clear to Plaintiff that Defendant Cook had a pattern of discrimination against persons with disabilities. Plaintiff's meetings with Defendant Cook became emotionally taxing as Defendant Cook's discriminatory and derogatory comments persisted, and Defendant Cook valued disparaging Corporate Defendants' employees over discussing important work matters.

75.    Unfortunately, Defendant Cook's discrimination did not end there.

76.    In November 2022, Plaintiff went to the emergency room with extreme abdominal pain that, after diagnosis, required close monitoring and surgical intervention. Plaintiff's physicians eventually diagnosed Plaintiff with an ovarian torsion, which is when the ovary twists around itself cutting off blood supply. The condition is incredibly serious.

77.    After antibiotic therapy and several imaging studies to closely monitor Plaintiff's condition, the surgery was eventually scheduled for January 9, 2023, and Plaintiff promptly reported this to Defendant Cook.

78.    Prior to Plaintiff's surgery, Defendant Cook suggested that Plaintiff take FMLA leave, but advised that the decision was Plaintiff's to make and that

FMLA was merely presented as an option.

79.    Notably, since 2013, Plaintiff had worked on a hybrid remote work schedule from her home in New Jersey and began working fully remote since the start of the COVID-19 Pandemic in March 2020, as did all the employees in Plaintiff's Office of R&D Alliances.

80.    Defendants provided Plaintiff with a company-issued laptop and remote access software for Plaintiff to work from her home in New Jersey.

81.    Defendants expected Plaintiff to conduct her regular duties and maintain productivity from her New Jersey office, and Plaintiff worked two to five days per week in New Jersey for Corporate Defendants for more than 10 years of her employment. Plaintiff conducted most, and eventually all, of her work from New Jersey.

82.    Plaintiff's husband is severely immunocompromised because of the treatment for his autoimmune disease, Multiple Sclerosis ("MS"), and the stem cell transplantation (autologous HSCT) procedure that he underwent in 2021 in an attempt to stop the progression of his MS. His immune system was completely wiped out after HSCT and he was extremely susceptible to infections during and after the procedure. Plaintiff's husband's physicians still advise that he postpone re-vaccinations (especially against Covid-19).

83.    Thus, Plaintiff was incredibly grateful that her prior supervisor

understood Plaintiff's need to continue working remotely for the health and safety of her husband.

84.     In fact, in March 2022 (prior to Defendant Cook's arrival in August 2022), Plaintiff and her co-workers in the Office of R&D Alliances completed a remote work agreement in accordance with Corporate Defendants' policies to receive authorization to continue to work from home. Everyone was offered a choice between remote, hybrid, or on-site working arrangement, and the entire department continued to work remotely.

85.     Plaintiff's request was approved, and her remote work arrangements were approved through June 2023.

86.     Therefore, when Defendant Cook suggested that Plaintiff take FMLA leave for her surgery, Plaintiff explained that she would be using her sick time as needed and would continue working throughout her recovery.

87.     Although Plaintiff's condition was serious, and her recovery was difficult, Plaintiff's dedication to her team was of the utmost importance to her and heavily influenced her decision to continue working during recovery.

88.     Plaintiff's work-from-home arrangement was essential to her ability to continue working during her recovery after a major abdominal surgery.

89.     Between January 12, 2023, and January 27, 2023, Plaintiff worked remotely while using approximately two sick days per week during her recovery.

90.    During this time, Plaintiff recognized a change in Defendant Cook's behavior toward her.

91.    Defendant Cook began to heavily scrutinize Plaintiff's work, despite no wrongdoing by Plaintiff to warrant such scrutiny, and Defendant Cook made the work environment increasingly stressful for Plaintiff and her team. Defendant Cook did not ask Plaintiff even once how her surgery went and how she felt.

92.    Plaintiff became suspicious that the change in Defendant Cook's behavior was directly related to her post-surgery disability and the need for her to use sick time during her recovery from surgery.

93.    On January 23, 2023, Plaintiff decided to report Defendant Cook's pattern of discriminatory behavior to Corporate Defendants' Cancer Center Director, Mr. Chernoff.

94.    Plaintiff explained the litany of issues with Defendant Cook's leadership that were a cause for concern, focusing on Defendant Cook's discriminatory and blatantly antisemitic comments about Corporate Defendants' employees.

95.    Plaintiff also explained that the increased scrutiny of her team in the weeks following Plaintiff's surgery had taken a toll on her recovery process.

96.    Remarkably, just days after Plaintiff reported Defendant Cook's discriminatory behavior, on January 27, 2023, Defendant Cook informed Plaintiff

that she must, retroactively, use FMLA leave for her sick days used after her surgery and that she cannot work until she presented a clearance note from her physician.

97.     As a result, Plaintiff was not allowed to work the remainder of the day and had to urgently call her physician to obtain clearance to work.

98.     Worse, on January 30, 2023, Defendant Cook began to target Plaintiff's work-from-home arrangement.

99.     Defendant Cook and Defendant Medlin presented Plaintiff with an accommodation form for her physician to fill out for her to remain working from home, despite Plaintiff's (as well as her co-workers') work-from-home arrangements being approved prior through June 2023.

100.    Although Plaintiff felt that Defendant Cook was setting Plaintiff up to revoke her authorization to work remotely, Plaintiff complied with Defendant Cook's directives and had her physician complete the accommodation form.

101.    Plaintiff's accommodation indicated that Plaintiff needed to work from home due to her disability and indicated that her job responsibilities were able to be completed at home as evidenced by her work-from-home arrangement for the past three years.

102.    Defendant Cook's increasing retaliation led Plaintiff to report the discrimination and retaliation to Corporate Defendants' Human Resources department.

103.    Accordingly, on February 2, 2023, Plaintiff sent Defendant Medlin the following complaint prior to a meeting with Defendant Medlin to discuss her accommodation request:

> Dear Amber:
>
> Thank you for providing the accommodation forms and I look forward to discussing this with you this afternoon. I also need to share the following information with you (some of which I have already shared with the Cancer Center Director). As you know, I have been employed at FCCC for over 15 years and currently serve as the Director of Technology Transfer and New Ventures.  This letter summarizes certain events that occurred in the last few months. I believe that I am being retaliated against for several events that have transpired during my employment.
>
> On October 27th, Sangeeta Bardhan Cook wrote to me on Teams (the screenshot attached) that Dr. Uzzo and Dr. Chernoff, "two white guys", only care about samples from underrepresented patient population because NCI is forcing them to, and that is why Temple does not work with them. I was shocked to hear such harsh words from Sangeeta who only had known Drs. Chernoff and Uzzo for three months when she wrote that, while I have known and worked with them for the last 15 years. There was another Teams message where she was expressing her unfavorable views of Johnathan Whetstine.
>
> During our 1:1 weekly Teams meetings in November-December 2022, Sangeeta also made many inappropriate comments about our investigators and senior administration. Specifically, in December, Sangeeta asked me, "Do you know which PI is the biggest manipulator?...It is Eti. She can play people in such a way that they would not even notice. When I was listening to her at some meetings, I thought that my ex Jewish boyfriends would behave in exactly the same way."  With

all due respect, it struck me as an anti-Semitic statement. Sangeeta also commented on another occasion that Israelis are the worst to negotiate with. Sangeeta does not know that my grandmother was Jewish and that all her family including little brothers and sisters, was killed (burned alive) by Nazis during the WWII. My grandmother was the only one who survived because she was a nurse at the front. I responded to Sangeeta that all my friends are Jewish, and that I grew up surrounded by Jewish students and teachers when I was a student at a specialized physics and math high school in St. Petersburg, Russia.

In addition to making inappropriate remarks, Sangeeta repeatedly criticized the senior administration and investigators to me and seemingly tried to get me to agree with her. On one occasion, when describing her meeting with Meg von Mehren about biosamples stored in Kathy Alpaugh's lab, Sangeeta mocked Dr. von Mehren by imitating her voice and responses, and complained that Meg could not address some of her questions about those biosamples. When she told me about her meeting with Jeremy Moore, Sangeeta asked me: "Do you think he is a rat? I think he is a rat. I told him some information about Whetstine (that he has no IP yet), let's see if it comes back to me". When I told Sangeeta that I have a good working relationship with Warren Kruger, Sangeeta said: "How can you like him?! I have met him, he came to talk to me." These are just some examples of the negative things that were said by Sangeeta about senior administration and investigators during my 1:1 Teams meetings. There are more that I can share in a meeting.

As you know, I have been working remotely (as has most of the people from the former R&D Alliances department; attached is my Remote Work Request Form that was previously approved through June 2023). You told me that remote work arrangements are decided at the departmental level. On July 12, 2022, even before Sangeeta joined, I had written to Joel Helmke to explain my family situation and even though I got no response from Joel, I heard from my

then-supervisor Kurt Schwinghammer that Joel told him things can remain status quo for now and I can continue working from home. After Sangeeta joined, I spoke with Sangeeta and we agreed that I will start coming to Fox Chase for in person meetings on a weekly basis when my immunocompromised husband with a walking disability feels stronger (around March timeframe).

In November 2022, I spent a weekend in the ER with extreme abdominal pain, and after some imaging and observation, I completed mandatory abdominal surgery on January 9. Prior to my surgery Sangeeta wrote to me that FMLA is an option but that it is my decision whether or not I take FMLA, and I also found out that I would only need to take medical leave if I take more than 3 consecutive sick days (which I did not). Between January 12-27 I was working remotely and taking 2-2.5 sick days per week to recover from the surgery. On Friday January 27th, I informed Sangeeta that I was taking the morning as sick time but would be working in the afternoon. She responded at 8:34 am "Thanks for letting us know but please take the whole day if needed…"

Then, at 11:38 am on this same day, Sangeeta wrote that I must take FMLA (retroactively) and that I cannot work until I present a note from my physician that I can return to work. As a result, even though I was not on FNLA, I was not allowed to work that afternoon and had to contact my physician urgently to address this request. On January 30th I was presented with accommodation forms for my doctor to fill out. Thus, my manager chose my post-surgical recovery to institute changes to my remote work arrangement and have me request a remote work accommodation due to a medical reason when I have been already working remotely along with the other people from the former R&D Alliances department. I believe it was done in retaliation for my sharing concerns (prior to January 27th) with senior leadership about the negative remarks made by Sangeeta.

On January 6, 2023, the day before my surgery, Sangeeta

informed me that from now on all IP related decisions would have to be run by her after accusing me of not checking with her regarding one recommendation that we made to an inventor after a Licensing Associate and I discussed the matter. However, during the 15 years that I have been at Fox Chase, I never had to run our IP related recommendations by my supervisor. As the Director of Technology Transfer (and before, as Associate Director of Business Development) I made those decisions in consultation with our outside IP attorneys. If this were a new expectation, then I should have been made aware of that by Sangeeta earlier.

These examples are just a few of many situations that made me feel that I am being retaliated against. When I responded to Sangeeta's email in late January during my post-surgical recovery and asked her why she has been so critical of me and my team even during my post-surgical recovery, she wrote back on 01/25 that I am "lashing out" because of all the events that are going on in my personal life and that my work in my capacity as a Director needs to be redistributed.

Many changes were introduced to our operation recently; one of them was that biosample licensing was put on hold and that will result in lower license revenues for FY23. I previously had expressed my concern to Sangeeta in December of 2022 that our goals need to be modified accordingly and she agreed with me verbally but it has not yet been done. I do not yet have the new goals and cannot modify the FY23 goals for the Licensing Associates who report to me. It is February already and we have less than 5 months to reach the goals that have not yet been finalized.

During my post-surgical recovery, I worked for several days each week and mentioned in one email to Sangeeta in a positive way that I took care of some pressing work matters (which meant that I responded to emails that needed my attention) and I was asked to summarize with date/time all the matters I was involved in during my

recovery and specify whether this was a regular or an urgent matter. I have worked in this institution (with excellent performance reviews) for 15 years, and I am being humiliated and treated as an intern who cannot separate urgent matters from regular. Why such micromanagement? Is that retaliation for standing up for myself and my team, or for responding the way I responded to the anti-Semitic remark, or simply because Sangeeta wants to hire someone else in my role and push me out? Why create such a hostile and stressful environment for me and my team?

I have a good working relationship with my tech transfer team that I built and trained. Last October Sangeeta instigated a conflict/confusion by reaching out to a Licensing Associate without including me, and making the Associate believe that Sangeeta did not want me to be involved in that discussion. The Licensing Associate was intimidated by Sangeeta and did not let me know for a few days about that email exchange. When she told me about it a few days later and I asked Sangeeta if there was a reason why I was not involved, she questioned why the Licensing Associate did not let me know about it immediately and presented it as if it were 100% fault of the Licensing Associate and accused us of having communication issues in my team.

Last Fall I offered to invite a local reputable investor from BioAdvance to speak to our investigators, Sangeeta rejected my request (see attached file) and instead, invited a member of her former COH team. I see no reason why two people could not have presented to our investigators on different topics. This investor has advised Fox Chase on several matters (including the Innovator Fund) and he is a very knowledgeable professional.

I consider Sangeeta's comments about the senior leadership and investigators, and the subsequent retaliatory events highly inappropriate and offensive, especially from someone in a leadership position. If Sangeeta was provoking me to see what I will say about

those people, then she has created an unhealthy working environment for the people in her team. I have been working with all these people for many years, and hearing these comments made me feel extremely uncomfortable.

Therefore, I would like to ask: are the negative remarks about Fox Chase's CEO, Cancer Center Director and senior investigators, the anti-Semitic statement, instigating conflict in my team by excluding me from conversations, humiliating me with micromanagement and creating an extremely stressful working environment during my recovery from a major surgery (and not even asking me once how my surgery went and how I feel) – is that all acceptable behavior?

Sincerely,

Inna

Inna Khartchenko, MS, MBA
Director, Technology Transfer and New Ventures

104.    Corporate Defendants purported to investigate Plaintiff's complaints and interviewed Plaintiff on February 15, 2023, via Zoom from her home office in New Jersey.

105.    While Plaintiff's accommodation request was ultimately approved on February 17, 2023, through May 13, 2023, it was imminently clear to Plaintiff that Defendant Cook was retaliating against Plaintiff by beginning the process to revoke Plaintiff's remote work arrangement.

106.    Following the investigation into Plaintiff's complaints, the stress caused by the workplace harassment had a detrimental impact on Plaintiff's physical and mental health.

107.   In fact, Plaintiff's doctors indicated that Plaintiff's stress levels contributed to complications during her recovery from surgery.

108.   Remarkably, in the wake of the investigation, Defendant Cook's retaliation persisted; Defendant Cook consistently publicly criticized Plaintiff, despite her criticisms being unwarranted; Defendant Cook micromanaged Plaintiff and her team in a direct effort to make Plaintiff look incompetent; and Defendant Cook even excluded Plaintiff from important meetings directly related to Plaintiff's job responsibilities.

109.   As a longstanding employee, coming up on her 16th year of employment with Corporate Defendants, Plaintiff **never** experienced anything like this before, and Plaintiff did nothing to warrant such incessant ridicule and scrutiny. It was pure retaliation.

110.   Despite knowing Plaintiff's accommodation to work remotely due to her own disability, as well as her husband's immunocompromised state, on April 14, 2023, Defendant Cook informed Plaintiff that she had to be on site three days per week beginning May 1, 2023, because her position is "director-level."

111.   Defendant Cook further instructed Plaintiff to write a return-to-office ("RTO") plan for her team. While preparing the RTO plan, Plaintiff questioned whether there was office space for her team as their office spaces were taken away from them when remote work agreements were signed in March 2022. Defendant

Cook wanted to bring employees back on-site but had not thought about office spaces for Plaintiff's direct reports. Plaintiff's plan was criticized, not taken into consideration and, instead, Defendant Cook sent her own RTO instructions to Plaintiff and her direct reports effectively undermining Plaintiff in the eyes of her direct reports.

112.   Plaintiff objected to Defendant Cook's plans to revoke the work-from-home arrangement for several reasons:

   a.  Plaintiff's work-from-home arrangement was approved in 2022 to last through June 2023 in accordance with Corporate Defendants' policies;

   b.  Plaintiff's medical accommodation authorizing her to work from home extended at least until May 13, 2023;

   c.  Plaintiff's disability warranted her work-from-home arrangement according to her physician;

   d.  Plaintiff's husband is severely immunocompromised, and forcing her to increase her exposure during his recovery while he cannot get vaccinated could be life-threatening to her husband;

   e.  Plaintiff has successfully worked 100% remotely in her director-level position for the past three years as evidenced by excellent performance reviews; and

   f.  Corporate Defendants do not have a policy indicating that director-level positions require the employee to be on site more days than other employees; to the contrary, Corporate Defendants approval of her work-from-home arrangement just months prior in 2022 indicated that Plaintiff's job responsibilities can be performed remotely, and several other director-level employees in other departments were working

remotely at the same time as was Plaintiff.

113.    Defendant Cook refused to consider Plaintiff's objections and insisted that Plaintiff work on-site three days per week in direct conflict with Plaintiff's preexisting medical accommodations.

114.    Defendant Cook's proffered pretextual reasons for revoking Plaintiff's work-from-home accommodation was merely a thinly veiled attempt to disguise her discriminatory and retaliatory motives.

## Plaintiff Blows the Whistle on Corporate Defendants' Unethical and Unlawful Business Affiliations with Russian Companies Financed by a Sanctioned Russian Fund.

115.    Defendants retaliatory conduct was not limited to Plaintiff's complaints of disability and religious/ethnic discrimination.

116.    Indeed, since Defendant Cook joined Corporate Defendants' workplace, Plaintiff was subjected to a hostile work environment and retaliation for reporting such discrimination and illegal conduct in the workplace.

117.    Specifically, on March 28, 2023, Plaintiff had a zoom meeting with Defendant Cook and Corporate Defendants' Licensing Associate, Tatiana Venkova.

118.    Defendant Cook informed Plaintiff that she needed Plaintiff's help negotiating with a company based out of Moscow, Russia, (hereinafter "Russian Company"), that presently held the rights to a promising anti-cancer drug.

119.    Defendant Cook explained that Corporate Defendants were considering

acquiring the intellectual property for that drug from Russian Company and needed Plaintiff's help because she speaks Russian.

120.   Plaintiff agreed to help, even though acquiring other organizations' intellectual property was not within her job responsibilities.

121.   Defendant Cook told Plaintiff during the same March 28, 2023 Teams meeting that as soon as she checks that "it was real" she would assign the project to Plaintiff to manage.

122.   Plaintiff was immediately apprehensive about working on this project.

123.   Plaintiff's father was born in Ukraine, and as an immigrant of Russian/Ukrainian origin herself, the Russian invasion of Ukraine has taken a great emotional toll on Plaintiff.

124.   Plaintiff worried that Corporate Defendants' affiliations with a Russian company, at the present time could pose serious problems for Corporate Defendants both legally and ethically.

125.   Accordingly, Plaintiff decided to research publicly available information on Russian Company to better understand the company's origin and funding sources.

126.   In less than thirty minutes, Plaintiff discovered that Russian Company was funded by the Russian Venture Company, which is part of the Russian Direct Investment Fund.

127. The Russian Direct Investment fund has direct ties to the Russian government and is currently sanctioned by the United States for violations of international law and for being owned or controlled by the Government of Russia under E.O. 14024.[8]

128. Plaintiff's research concluded that the Russian Company has shared executive management, as well as board of directors associated with companies owned by certain Russian oligarchs sanctioned by many countries including the United States.

129. Plaintiff reasonably believed that there was a substantial risk with Corporate Defendants' plans to acquire the intellectual property covering the drug developed by a Russian Company sponsored by the sanctioned fund with direct ties to the Russian government.

130. After reviewing her findings, Plaintiff raised her concerns with Defendant Cook. Plaintiff explained that she believed Corporate Defendants should not be negotiating with and acquiring intellectual property rights from a company that was sponsored by a Russian investment fund with direct ties to the Russian government and is presently sanctioned by the United States government.

131. Plaintiff reasonably believed that proceeding with such a deal at the

---

[8] *See* https://home.treasury.gov/news/press-releases/jy0612 and https://sanctions.nazk.gov.ua/en/sanction-company/6/.

present time would be unlawful and in direct violation of President Biden's Executive Orders. Indeed, the U.S. government ordered for companies to comply with President Biden's Russia-related sanctions to avoid potential prosecution or enforcement actions.[9]

132.    Beyond the illegality of the situation, Plaintiff further objected to the business dealing as she believed the conduct to be highly unethical given the current geopolitical state created by the situation in Ukraine.

133.    The Russian invasion of Ukraine has been one of the most egregious violations of international law the world has seen in years, and the revenues generated by the Russian Direct Investment Fund, and thus Russian Company, would directly support Russia's invasion of Ukraine.

134.    On April 11, 2023, Corporate Defendants' General Counsel, Jerome Maddox, emailed Plaintiff and Defendant Cook regarding the deal.

135.    Plaintiff immediately responded that she had concerns she would like to share with Defendant Maddox that she had already reported to Defendant Cook and asked to set up a call with Defendant Maddox to discuss.

136.    Since Defendant Cook was refusing to take Plaintiff's complaints seriously, Plaintiff knew that she had to report her concerns to another member of Corporate Defendants' leadership team.

---

[9] *See* https://www.reuters.com/business/us-urges-companies-comply-with-russia-related-sanctions-2023-03-02/.

137.   When Plaintiff learned that Defendant Maddox was the other member of leadership working on this matter, Plaintiff decided that she needed to raise her concerns with Defendant Maddox as well. Plaintiff hoped that Defendant Maddox would recognize that Plaintiff's complaints were made in good faith and that Defendant Cook was improperly ignoring the issues that could arise from conducting business with this Russian Company.

138.   On April 14, 2023, during the Teams call with Defendants Cook and Maddox, Plaintiff reiterated that she believed it was unethical for Corporate Defendants to negotiate/enter into a deal with a company she reasonably believed to be financed by a sanctioned Russian entity and a sanctioned Russian individual.

139.   The following day, in an effort to reiterate the fact Plaintiff did not believe Defendants were properly investigating Russian Company, Plaintiff wrote to Defendant Maddox suggesting he have law enforcement agencies check into Russian Company before proceeding with the deal.

140.   Defendant Maddox did not respond to Plaintiff's email of April 15, 2023, but instead called Plaintiff on April 18, 2023. Defendant Maddox then told Plaintiff that Corporate Defendants would "be okay with the PR" if the deal went forward.

141.   After the April 14, 2023 Teams meeting, Plaintiff believed that Defendants Cook and Maddox either did not properly research and investigate the

company, or Defendant Cook intentionally failed to relay the information to allow

Corporate Defendants to move forward with the project despite the unlawful and

unethical nature of the transaction.

142.  Plaintiff understandably feared that her involvement with this project

could pose a serious risk to her career, especially due to her Russian/Ukrainian

origin.

143.  Accordingly, Plaintiff sent the following complaint to Defendant Cook

on April 17, 2023:

> Sangeeta,
>
> When you shared some of your thoughts and plans related to the [possible acquisition of the IP covering the Russian anti-cancer drug] with me and Tania during our Teams meeting on March 28th, you stated that as soon as you check that "it is real", you want to give it to me to manage. That prompted me to do some diligence and I immediately shared the results with you. When I asked you whether or not you knew that information, you had told me that you had already known it and discussed internally several weeks ago. What puzzles me is the fact that **you were planning to give it to me to manage without disclosing all the information and informing me of the concerns associated with it**. **If had not proactively done due diligence after our meeting on March 28th and had not shared my concerns with you and my unwillingness to participate in this negotiation, you could have gotten me involved in this project without me knowing all the problematic background information surrounding it, and this could have created serious problems for me in the future, personally and professionally**.
>
> Note that I did not disclose any details in this email

intentionally.

Inna

### Defendants Retaliate Against Plaintiff for Her Complaints of Discrimination and Reports of Illegal and Unethical Business Practices, Ultimately Culminating in her Unlawful Termination.

144.   Remarkably, *one day* after Plaintiff complained to Defendant Cook about her intentional, or at the very least negligent, investigation into the illegality of Corporate Defendants' affiliations with a sanctioned Russian company, and *mere days* after Plaintiff objected to Defendant Cook's revocation of Plaintiff's remote work accommodations, Corporate Defendants' "investigation" into Plaintiff's complaints from February ended.

145.   Plaintiff did not hear anything about the results of the February investigation and complained to Defendant Medlin about the same in an email on April 15, 2023. In response to Plaintiff's complaint, Defendant Lasky emailed Plaintiff three days later on April 18, 2023, to inform her that her allegations were unfounded, and that the February investigation did not uncover anything unlawful in Defendant Cook's conduct.

146.   Plaintiff later learned that the investigation may not have been independent at all because the law firm that conducted the investigation lists the spouse of a member of Corporate Defendants' legal department as one of its partners.

147.   When Plaintiff asked additional questions in her email response to Defendant Lasky, he wrote the following:

Hello, Inna.
You have identified the distinction: unlawful and inappropriate. The conclusion is that the comments as set forth do not constitute unlawful conduct. Indeed, the conclusion is that there was no unlawful conduct, including discrimination or retaliation.

We used a distinguished law firm to conduct this review. That group has deep skills in this area. To the extent there was inappropriate (but not unlawful), conduct, TUHS will respond.

In your note to me (below), you suggest retaliation. We will review this allegation.

To the extent there was inappropriate but not unlawful conduct, TUHS will respond. I cc Amber Medlin.

John

148.    Even more shocking, just hours later, and the same day Corporate Defendants' General Counsel, Defendant Maddox, had informed Plaintiff that Corporate Defendants were prepared for the "PR" fallout from the proposed deal, Defendant Cook and Defendant Medlin scheduled a Teams meeting for the following day with Plaintiff.

149.    During this meeting, Defendants issued Plaintiff a final written warning and placed Plaintiff on a performance improvement plan ("PIP"). This was pure retaliation.

150.    The temporal proximity between Plaintiff's complaints of discrimination and retaliation against Defendant Cook, her objection to Defendants'

illegal business practices, Defendant Lasky's conclusion of the investigation into Plaintiff's complaints, and Defendants Cook and Medlin issuing Plaintiff's final written warning, alone raises an inference of retaliation.

151.   Further, Defendants' final written warning described Plaintiff's reports of unlawful conduct as "assuming malicious intent in others," essentially admitting that the discipline was issued due to Plaintiff's complaints.

152.   After Defendant Cook issued Plaintiff this discipline, Plaintiff asked how she could receive a final warning if she never received any warnings, whether written or oral, during her 15 years of service to Corporate Defendants, but Defendant Cook ignored Plaintiff's inquiry.

153.   The final written warning purported that Plaintiff had been on notice that Defendants were unsatisfied with her performance for the past six months.

154.   To the contrary, Defendants *never* discussed Plaintiff's performance during this time.

155.   In fact, Plaintiff was only aware that as of the last time Defendants evaluated Plaintiff's performance, in Fiscal Year 2022, Plaintiff received the rating of "role model" in every category in which she was evaluated, including "current fiscal year goals," "core values," "everyone leads," and "overall summary."

156.   Notably, "role model" is the highest rating and requires "[o]verall performance    [that]    consistently    exceeds    standards/expectations"    and

"[c]ontributions and results [that] significantly exceed expectations and represent top performance."

157. Furthermore, Plaintiff's former manager, Kurt Schwinghammer, indicated in the performance review that Plaintiff was ***instrumental*** in the positive outcome of negotiations and litigations which resulted in a 139% increase in license revenues from Fiscal Year 2021 to Fiscal Year 2022. In fact, the FY2022 license revenues received by Defendant FCCC were the highest on record. Despite that, Defendant Cook later instructed Plaintiff not to report the license revenues and other technology transfer statistics for FY2022 to the Association of University Technology Managers that conducts annual surveys of the technology transfer activity. Ms. Cook's instructions surprised Plaintiff, but she complied and instructed her team to not proceed with the survey submission.

158. Indeed, Mr. Schwinghammer indicated that Plaintiff's leadership exceeded expectations, resulting in unprecedented numbers of received invention disclosures, companies targeted for marketing technologies, and license revenues.

159. Mr. Schwinghammer also noted that Plaintiff's work on two litigation matters was extremely valuable and aided in Defendant FCCC resolving both matters. Mr. Schwinghammer stated that Plaintiff was instrumental in creating the new Innovator Fund and independently pulled together an outstanding team of external advisors for the Fund.

160.   In addition, Mr. Schwinghammer acknowledged that Plaintiff worked with a Defendant FCCC investigator and the University City Science Center which resulted in the first QED award issued to Defendant FCCC.

161.   Mr. Schwinghammer further stated,

It was a genuine pleasure to work with Inna as part of R&D Alliances, specifically as she leads the Technology Transfer and New Ventures Team. Inna is friendly and polite to everyone she meets and she takes time to listen to others. Inna helps others when asked and she respects confidentiality. I have found that Inna provides comprehensive information to others and more specifically, to me when I ask for information. Inna routinely makes others feel welcome and at ease. I have noticed that Inna makes extra effort to perform at a high level, and displays a strong sense of pride and ownership in her work. Inna is indeed a team player pitching in to help attain team goals and indeed, those of the institution.

As in prior years, [Plaintiff] had an outstanding year and it has been a pleasure to work closely with her. As indicated in the above statements of [Plaintiff's] achievements against her goals, she surpassed all. [Plaintiff] epitomizes respect, service and quality, and she is a role model who embraces the institution standards associated with everyone being a leader. . . . [Plaintiff] achieved and surpassed each of her performance goals for FY22, she holds high the institutional core values and she is truly a leader within R&D Alliances and indeed, within Fox Chase and TUHS. I wish [Plaintiff] continued success in her role(s) at Fox Chase!

162.   After the termination of her employment, a Defendant FCCC inventor thanked Plaintiff in August 2023 for her role and persistence in the resolution of an arbitration matter that recently resulted in favor of Defendant FCCC.

163.   Despite numerous requests from Plaintiff, Defendant Cook failed to set/approve Plaintiff's FY23 goals and/or schedule performance discussions in December 2022 and March 2023. Plaintiff had reached out to Defendant Cook several times during the last fiscal year to remind her that Plaintiff was unable to approve goals for her team until after her own FY23 goals were approved by Defendant Cook, but to no avail.

164.   Notably, the only thing that had changed during the time that Defendants purport Plaintiff's performance to be "unsatisfactory" was that Plaintiff began reporting Defendant Cook's pattern of discrimination, retaliation, and unlawful business practices.

165.   Accordingly, on April 20, 2023, the undersigned counsel sent Corporate Defendants notice of Plaintiff's intent to file this lawsuit.

166.   The following day, Plaintiff exposed the retaliatory nature of the final written warning and the PIP in a complaint she sent to Defendant Maddox and Defendant Medlin.

167.   Following the issuance of the PIP, Defendant Cook required Plaintiff to meet with her on a weekly basis and forced Plaintiff to sign the final written warning and the PIP.

168.   In response, Plaintiff sent the following complaint to Defendant Cook, Defendant Maddox, and Defendant Medlin, once again reiterating that she believed

these disciplinary measures to be retaliatory:

>Dear All:
>
>I received a note from Sangeeta via Adobe Sign today stating that if the institution does not receive the attached documents signed by me by the end of the business day, you will note "refusal to sign" on these documents. To acknowledge the receipt of the documents, I have signed them (attached). Please note that I disagree with both documents and consider them as retaliation against me.
>
>Please note that Sangeeta never set my goals for this FY and no expectations have been formally set; no performance checkup point meetings have been held this year either. When I brought up the fact that we need to change the goals that we entered into the system due to a pause put on biosample licensing, Sangeeta told me in December to send her the goals that my direct reports and I had in the system, which I did but we never had any further discussions. We would have welcomed all these discussions last summer and Fall after Sangeeta joined Fox Chase. I have always provided all the information Sangeeta requested from my team and me. It is not fair to treat me this way after more than 15 years of excellent performance and service to FCCC.
>
>As an example of my significant contributions to Fox Chase, I relentlessly worked on [Business Name Redacted for Confidentiality] litigation for more than a year, and it finally got settled in July 2022. The team relied on me, the information and arguments that I provided. The previous outside counsel almost settled and paid [Business Name and Amount Redacted for Confidentiality] in January 2022, and I reached out to John Ryan [EVP, General Counsel of TUHS] to introduce myself and expressed my concerns about how that case was managed by the external counsel. In the end, the outcome changed favorably for Fox Chase. Why no one is acknowledging my contributions over the years? Why have I gotten this unfair Final Written Warning and Performance Improvement

43

Plan?

169.    Throughout her last two months, Plaintiff worked long hours, into the late evening, to meet the ridiculous expectations of the PIP in an effort to save herself from a retaliatory termination.

170.    However, Defendant Cook's retaliation only progressed, and Defendant Cook took every opportunity to make Plaintiff's job more difficult and establish retaliatory barriers to set Plaintiff up to fail.

171.    Defendant Cook's retaliatory conduct included, but was not limited to, the following:

      a.    Defendant Cook continued to keep Plaintiff out of projects that were essential to her job responsibilities and then indicated that she was underperforming on such projects during her PIP check-in meetings;

      b.    Defendant Cook reprimanded Plaintiff for not completing tasks that Defendant Cook explicitly instructed Plaintiff to postpone until Defendant Cook provided additional instructions;

      c.    Defendant Cook public undermined and micromanaged Plaintiff on projects that Plaintiff was properly managing and efficiently completing; and

      d.    Despite Plaintiff's numerous requests and reminders, Defendant Cook repeatedly refused to set/approve FY23 goals for Plaintiff and her team to ensure that they are meeting Defendant Cook's expectations ahead of performance reviews.

172.    Defendant Cook's retaliatory conduct was a transparent attempt to make it look like Plaintiff was not meeting expectations to establish pretextual

reasons for her termination.

173.   Plaintiff was scheduled to have the final weekly check-in meeting with Defendant Cook on June 20, 2023. Defendant Cook's executive assistant, Julie Freedman, informed Plaintiff on June 20, 2023, that Defendant Cook rescheduled the meeting to the next day.

174.   On June 21, 2023, Plaintiff logged into the rescheduled meeting from her home in New Jersey to find Defendants Cook and Medlin waiting for her.

175.   Defendant Cook displayed a proud and sinister smirk before terminating Plaintiff's 15-years-long employment in under 60 seconds over a Teams meeting.

176.   After almost two decades of dedicated service to Corporate Defendants, Defendants' decision to terminate Plaintiff's employment effective June 21, 2023, was discriminatorily based upon her disability, her complaints of racial discrimination, and her reports of unethical business practices in violation of state and federal law. .

177.   Defendants' pretextual assertion that Plaintiff was terminated for performance issues is severely undermined by the plethora of positive references she received via LinkedIn after her termination from her former colleagues including, but not limited to, the Cancer Center Director and Senior Vice President, Mr. Chernoff.





178.   In addition, Plaintiff has learned of additional allegations supporting her claims of discrimination and retaliation.

179.   Specifically, on February 13, 2025, Plaintiff and her counsel received a detailed "anonymous" tip, which upon information and belief came from an employee within or connected to the Defendants.

180.   The individual corroborated Plaintiff's allegations of discrimination and retaliation against Defendant Cook. Specifically, noting that:

a.     In March 2023, Defendant Cook stated in writing that she wanted to terminate Plaintiff, and that Plaintiff's February 2023 HR complaint was the driving force to terminate her employment;

b.     In April 2023, Defendant Cook admitted in writing that the revocation of work-from-home privileges was devised to force Plaintiff to be on site in retaliation for her complaint against Defendant Cook;

c.     In April 2023, in response to Plaintiff's claims of retaliation, Defendant Cook asked HR – in writing – to "ramp up" the termination, and indicated that Plaintiff would be terminated regardless of her performance on the PIP; and

d.     Defendant Cook had exhibited hostility towards a coworker of Russian/Ukrainian descent at her previous job, supporting Plaintiff's allegations of Defendant Cook's discriminatory animus towards Plaintiff's national origin and ethnicity. Indeed, the individual noted that Defendant Cook referred to Plaintiff as the "Crazy Russian Lady" in writing.

181.   These allegations evince that Defendants' proffered reasons for Plaintiff's termination were mere pretext.

182.   The minute Plaintiff spoke up about Defendant Cook's discriminatory behavior towards Plaintiff and her colleagues due to her disability, national origin,

ethnicity, and their religions, Defendant Cook concocted a retaliatory scheme to terminate Plaintiff's employment.

183.   This, coupled with Plaintiff's complaints of unlawful business practices, ultimately resulted in her retaliatory termination.

184.   Defendants' decision to wrongfully terminate Plaintiff's employment was made in retaliation for her availing herself of rights and privileges guaranteed to her under the law such as the right to request and receive a reasonable accommodation for her medical disability.

185.   Defendants' decision to wrongfully terminate Plaintiff's employment was made in retaliation for her blowing the whistle on Corporate Defendants' unlawful, unethical business dealings with a Russian company sponsored by a sanctioned fund with direct ties to the Russian government.

186.   Corporate Defendants, at all times relevant hereto, are responsible as a matter of law for the acts and/or omissions of its responsible administrators, managers, supervisors, and employees including, but not limited to, Defendants Cook, Lasky, Medlin, and Maddox.

187.   As a result of the decision made by Defendants, Plaintiff has been and continues to suffer economic losses and pecuniary damages including but not limited to lost income and benefits past, present and future.

188.   Corporate Defendants subjected Plaintiff to an egregious termination

after she dedicated her career to their companies.

189.   Plaintiff has been and continues to suffer severe emotional distress as a result of Defendants' unlawful and discriminatory termination.

## COUNT ONE

## NJLAD – DISPARATE TREATMENT & DISCRIMINATION DUE TO DISABILITY

190.   Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

191.   The treatment received from Defendants violates the NJLAD, which prohibits unlawful employment discrimination against any person because of race, religion, age, gender, handicap, marital status, national origin, sexual orientation, etc.

192.   Plaintiff's disabilities fit the definition of handicap under the NJLAD.

193.   The above-described conduct would not have occurred but for Plaintiff's disabilities.

194.   Defendants did not have an effective anti-discrimination policy in place, Defendants have not maintained an anti-discrimination policy that is current and effective, and Defendants' anti-discrimination policy existed in name-only.

195.   Defendants did not maintain useful formal and informal complaint structures for victims of discrimination, harassment, or retaliation.

196.   Defendants did not properly train their supervisors and/or employees

on the subjects of discrimination, harassment, and retaliation.

197.   Defendants failed to institute appropriate monitoring mechanisms to check the effectiveness of the policies and complaint structures.

198.   Defendants did not have a commitment from the highest levels of management that discrimination and harassment will not be tolerated.

199.   As the employer, employee, and/or supervisor of Plaintiff, Defendants are vicariously, strictly, and/or directly liable to Plaintiff pursuant to the NJLAD, in that the affirmative acts of harassment, discrimination, and retaliation committed by Individual Defendants occurred within the scope of their employment; and/or Defendants were deliberately indifferent, reckless, negligent and/or tacitly approved the discrimination, hostile work environment, and/or retaliation; and/or Defendants failed to create and/or have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms for same despite the foreseeability of harassment, discrimination, and retaliation in the workplace; and/or by having actual knowledge of the harassment, discrimination, and retaliation of Plaintiff and failing to promptly and effectively act to stop it.

200.   Individual Defendants had the "authority to hire, fire, discipline, control employees' wages or control [Plaintiff's] schedule[]." Herman v. Coastal Corp., 348 N.J. Super. 1, 28 (App. Div. 2002).

201.   Individual Defendants aided, abetted, incited, compelled and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce each other and/or Corporate Defendants to commit acts and omissions that were in violation of the NJLAD by committing affirmatively discriminatory, harassing, and/or retaliatory acts toward Plaintiffs, which are in violation of their duties to halt or prevent harassment, rendering Corporate Defendants and themselves individually and collectively liable to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

202.   Individual Defendants have direct involvement in Plaintiff's discrimination and retaliation. Individual Defendants aided in conduct that caused injury to Plaintiff, Individual Defendants were generally aware of their role in the unlawful conduct, and Individual Defendants knowingly and substantially assisted in the unlawful conduct.

203.   As Plaintiff's supervisors, Individual Defendants' unlawful conduct imposes liability on themselves and Corporate Defendant under the NJLAD. See Hurley v. Atl. City Police Dep't, 174 F.3d 95, 126 (3d Cir. 1999) (When a supervisor engages in "affirmatively harassing acts", he "flouts [his] duty" and "subjects himself and his employer to liability."); see also Rowan v. Hartford Plaza Ltd, LP, 2013 N.J. Super. Unpub. LEXIS 766, at *18-19 (App. Div. Apr. 5, 2013); Yobe v. Renaissance Elec., Inc., Civil Action No. 15-3121, 2016 U.S. Dist. LEXIS 18227, at *12 (D.N.J. Feb. 16, 2016).

204. Individual Defendants' unlawful conduct, irrespective of their supervisory role, imposes liability on themselves and Corporate Defendant under the NJLAD. See N.J.S.A. 10:5-12(e) (unlawful for "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."); Cicchetti v. Morris County Sheriff's Office, 194 N.J. 563, 568 (2008) (holding that individual liability is limited to "acts that constitute aiding or abetting," without requiring that the individual also qualify as a supervisor); Raber v. Express Scripts Hold. Co., No. 18-cv-8639, 2019 U.S. Dist. LEXIS 34444 (D.N.J. Mar. 5, 2019); Stouch & Bodnar v. Dep't of Child Protection and Permanency, et al., Docket No. BUR-L-151-19 (Law Div. May 12, 2020).

205. Corporate Defendants aided, abetted, incited, compelled and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Individual Defendants to commit acts and omissions that were in violation of the NJLAD by committing affirmatively discriminatory, harassing, and/or retaliatory acts toward Plaintiff, which are in violation of their duties to halt or prevent harassment, rendering Corporate Defendants and Individual Defendants individually and collectively liable to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

206.    As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages, including ongoing emotional distress and significant economic damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the NJLAD, punitive damages, pre-and post-judgment interest, attorneys' fees and costs of suit, and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.    Reinstatement of employment and all benefits;
B.    Back pay and benefits;
C.    Front pay and benefits;
D.    Compensatory damages;
E.    Consequential damages;
F.    Reinstatement;
G.    Punitive damages;
H.    Prejudgment interest and enhancements to off-set negative tax consequences;
I.    Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J.    Such other relief as may be available pursuant to the NJLAD and which the Court deems just and equitable;
K.    Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;
L.    Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;
M.    Ordering Defendants to undergo anti-discrimination training;

N.  Ordering Defendants to undergo anti-retaliation training;

O.  Ordering Defendants to undergo anti-harassment training;

P.  Ordering Defendants to undergo workplace civility training;

Q.  Ordering Defendants to undergo bystander intervention training;

R.  Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;

S.  Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;

T.  Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U.  Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V.  Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W.  Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X.  Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y.  Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z.  Such other relief as may be available and which the Court deems just and equitable.

## COUNT TWO

## NJLAD – DISABILITY DISCRIMINATION:  FAILURE TO ACCOMMODATE AND FAILURE TO ENGAGE IN THE INTERACTIVE PROCESS

207.  Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

208.  The conduct of Defendants as detailed above constitutes disability discrimination, specifically the failure to reasonably accommodate disabled persons,

and the failure to engage in the interactive process required by New Jersey law.

209.    As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the NJLAD, punitive damages, pre- and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.    Reinstatement of employment and all benefits;
B.    Back pay and benefits;
C.    Front pay and benefits;
D.    Compensatory damages;
E.    Consequential damages;
F.    Reinstatement;
G.    Punitive damages;
H.    Prejudgment interest and enhancements to off-set negative tax consequences;
I.    Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J.    Such other relief as may be available pursuant to the NJLAD and which the Court deems just and equitable;
K.    Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;
L.    Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;
M.    Ordering Defendants to undergo anti-discrimination training;

N.    Ordering Defendants to undergo anti-retaliation training;

O.    Ordering Defendants to undergo anti-harassment training;

P.    Ordering Defendants to undergo workplace civility training;

Q.    Ordering Defendants to undergo bystander intervention training;

R.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;

S.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;

T.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U.    Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V.    Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W.    Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X.    Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y.    Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z.    Such other relief as may be available and which the Court deems just and equitable.

## COUNT THREE

## NJLAD – DISCRIMINATION, HOSTILE WORK ENVIRONMENT, & DISPARATE TREATMENT DUE TO RELIGION, NATIONAL ORIGIN, AND/OR ETHNICITY

210.  Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

211.   Plaintiff was subjected to severe, pervasive, and continuing instances of discrimination, disparate treatment, and harassment based on religion, national origin, and/or ethnicity.

212.   The aforementioned conduct would not have occurred but for Plaintiff's national origin, religion, and/or ethnicity, and/or her reports of religious, national origin, and ethnic discrimination.

213.   The harassing and discriminatory conduct was severe or pervasive enough to make a reasonable person and employee believe that the conditions of employment were altered, and the working environment was hostile and discriminatory.

214.   As the employer, employee, and/or supervisor of Plaintiff, Defendants are vicariously, strictly, and/or directly liable to Plaintiffs pursuant to the NJLAD, in that the affirmative acts of harassment, discrimination, and retaliation committed by Individual Defendants occurred within the scope of their employment; and/or Defendants were deliberately indifferent, reckless, negligent and/or tacitly approved the discrimination, hostile work environment, and/or retaliation; and/or Defendants failed to create and/or have in place well-publicized and enforced anti-harassment policies, effective formal and informal complaint structures, training, and/or monitoring mechanisms for same despite the foreseeability of harassment, discrimination, and retaliation in the workplace; and/or by having actual knowledge

of the harassment, discrimination, and retaliation of Plaintiff and failing to promptly and effectively act to stop it.

215.    Individual Defendants had the "authority to hire, fire, discipline, control employees' wages or control [Plaintiff's] schedule[]." Herman v. Coastal Corp., 348 N.J. Super. 1, 28 (Super. Ct. App. Div. 2002).

216.    Individual Defendants aided, abetted, incited, compelled and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce each other and/or Corporate Defendants to commit acts and omissions that were in violation of the NJLAD by committing affirmatively discriminatory, harassing, and/or retaliatory acts toward Plaintiffs, which are in violation of their duties to halt or prevent harassment, rendering Corporate Defendants and themselves individually and collectively liable to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

217.    Individual Defendants have direct involvement in Plaintiff's discrimination and retaliation. Individual Defendants aided in conduct that caused injury to Plaintiff, Individual Defendants were generally aware of their role in the unlawful conduct, and Individual Defendants knowingly and substantially assisted in the unlawful conduct.

218.    As Plaintiff's supervisors, Individual Defendants' unlawful conduct imposes liability on themselves and Corporate Defendant under the NJLAD. See Hurley v. Atl. City Police Dep't, 174 F.3d 95, 126 (3d Cir. 1999) (When a supervisor

engages in "affirmatively harassing acts", he "flouts [his] duty" and "subjects himself and his employer to liability."); see also Rowan v. Hartford Plaza Ltd, LP, 2013 N.J. Super. Unpub. LEXIS 766, at *18-19 (App. Div. Apr. 5, 2013); Yobe v. Renaissance Elec., Inc., Civil Action No. 15-3121, 2016 U.S. Dist. LEXIS 18227, at *12 (D.N.J. Feb. 16, 2016).

219.    Individual Defendants' unlawful conduct, irrespective of their supervisory role, imposes liability on themselves and Corporate Defendant under the NJLAD. See N.J.S.A. 10:5-12(e) (unlawful for "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this act, or to attempt to do so."); Cicchetti v. Morris County Sheriff's Office, 194 N.J. 563, 568 (2008) (holding that individual liability is limited to "acts that constitute aiding or abetting," without requiring that the individual also qualify as a supervisor); Raber v. Express Scripts Hold. Co., No. 18-cv-8639, 2019 U.S. Dist. LEXIS 34444 (D.N.J. Mar. 5, 2019); Stouch & Bodnar v. Dep't of Child Protection and Permanency, et al., Docket No. BUR-L-151-19 (Law Div. May 12, 2020).

220.    Corporate Defendants aided, abetted, incited, compelled and/or coerced, and/or attempted to aid, abet, incite, compel and/or coerce Individual Defendants to commit acts and omissions that were in violation of the NJLAD by committing affirmatively discriminatory, harassing, and/or retaliatory acts toward

Plaintiff, which are in violation of their duties to halt or prevent harassment, rendering Corporate Defendants and Individual Defendants individually and collectively liable to Plaintiff pursuant to N.J.S.A. 10:5-12(e).

221. As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages, including ongoing emotional distress and significant economic damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the NJLAD, punitive damages, pre-and post-judgment interest, attorneys' fees and costs of suit, and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.   Reinstatement of employment and all benefits;
B.   Back pay and benefits;
C.   Front pay and benefits;
D.   Compensatory damages;
E.   Consequential damages;
F.   Reinstatement;
G.   Punitive damages;
H.   Prejudgment interest and enhancements to off-set negative tax consequences;
I.   Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J.   Such other relief as may be available pursuant to the NJLAD and which the Court deems just and equitable;

K.  Ordering Defendants to take appropriate corrective action to stop and prevent retaliation at the workplace;

L.  Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;

M.  Ordering Defendants to undergo anti-discrimination training;

N.  Ordering Defendants to undergo anti-retaliation training;

O.  Ordering Defendants to undergo anti-harassment training;

P.  Ordering Defendants to undergo workplace civility training;

Q.  Ordering Defendants to undergo bystander intervention training;

R.  Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;

S.  Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;

T.  Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U.  Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V.  Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W.  Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X.  Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y.  Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z.  Such other relief as may be available and which the Court deems just and equitable.

## **COUNT FOUR**

## **NJLAD – RETALIATION/IMPROPER REPRISAL**

222.  Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

223.  Defendants took retaliatory action against Plaintiff by terminating Plaintiff after she requested a reasonable accommodation for her medical disability,

and reported national origin, ethnic, and religious discrimination.

224.   Defendants are vicariously, strictly, and/or directly liable to Plaintiff for unlawful retaliation in violation of the NJLAD pursuant to N.J.S.A. 10:5-12(d).

225.   As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under the NJLAD, punitive damages, pre- and post-judgment interest, attorneys' fees and costs of suit, and for such other relief that the Court deems equitable and just. More specifically, Plaintiff demands judgment against Defendants for harm suffered in violation of the NJLAD as follows:

A.   Reinstatement of employment and all benefits;
B.   Back pay and benefits;
C.   Front pay and benefits;
D.   Compensatory damages;
E.   Consequential damages;
F.   Reinstatement;
G.   Punitive damages;
H.   Prejudgment interest and enhancements to off-set negative tax consequences;
I.   Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);
J.   Such other relief as may be available pursuant to the NJLAD and which the Court deems just and equitable;
K.   Ordering Defendants to take appropriate corrective action to

stop and prevent retaliation at the workplace;

L.    Ordering Defendants to take appropriate corrective action to stop and prevent harassment at the workplace;

M.    Ordering Defendants to undergo anti-discrimination training;

N.    Ordering Defendants to undergo anti-retaliation training;

O.    Ordering Defendants to undergo anti-harassment training;

P.    Ordering Defendants to undergo workplace civility training;

Q.    Ordering Defendants to undergo bystander intervention training;

R.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-discrimination training;

S.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-retaliation training;

T.    Ordering Defendants to engage a research organization to assess the effectiveness of their anti-harassment training;

U.    Ordering Defendants to engage a research organization to assess the effectiveness of their workplace civility training;

V.    Ordering Defendants to engage a research organization to assess the effectiveness of their bystander intervention training;

W.    Ordering Defendants to identify an appropriate professional to investigate any future complaints of discrimination;

X.    Ordering Defendants to identify an appropriate professional to investigate any future complaints of harassment;

Y.    Ordering Defendants to identify an appropriate professional to investigate any future complaints of retaliation; and

Z.    Such other relief as may be available and which the Court deems just and equitable.

## COUNT FIVE

## RETALIATION IN VIOLATION OF NEW JERSEY CONSCIENTIOUS EMPLOYEE PROTECTION ACT ("CEPA")

226.    Plaintiff incorporates each and every allegation set forth above as if repeated fully herein at length.

227.    CEPA's purpose, as pronounced by the New Jersey Supreme Court, "is

to protect and encourage employees to report illegal or unethical workplace activities

and to discourage … employers from engaging in such conduct."

228.   CEPA specifically provides that:

> An employer shall not take any retaliatory action against an employee because the employee does any of the following:

> a.    Discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer, or another employer, with whom there is a business relationship, that the employee reasonably believes:

> > (1)   is in violation of a law, or a rule or regulation promulgated pursuant to law, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care; or

> > (2) is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity;

> b.    Provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any violation of law, or a rule or regulation promulgated pursuant to law by the employer, or another employer, with whom there is a business relationship, including any violation involving deception of, or misrepresentation to, any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity, or, in the case of an

employee who is a licensed or certified health care professional, provides information to, or testifies before, any public body conducting an investigation, hearing or inquiry into the quality of patient care; or

c.  <u>Objects to, or refuses to participate in any activity, policy or practice which the employee reasonably believes</u>:

(1)  <u>is in violation of a law</u>, or a rule or regulation promulgated pursuant to law, including <u>any violation involving deception of, or misrepresentation to,</u> <u>any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer</u> or any governmental entity, or, if the employee is a licensed or certified health care professional, constitutes improper quality of patient care;

(2)  is fraudulent or criminal, including any activity, policy or practice of deception or misrepresentation which the employee reasonably believes may defraud any shareholder, investor, client, patient, customer, employee, former employee, retiree or pensioner of the employer or any governmental entity; or

(3)  is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment.

N.J.S.A. 34:19-3 (emphasis added).

229.  Throughout the course of her employment, Plaintiff reported and complained of unlawful conduct occurring within Defendants workplace.

230.  Plaintiff reasonably believed that Defendants' affiliations and a pending business deal with a Russian Company sponsored by a sanctioned Russian investment fund with direct ties to the Russian government violated Executive Order

E.O. 14024, State law, rules, and regulations, and/or was incompatible with a clear mandate of public policy concerning the public health, safety, or welfare.

231.   Defendants had knowledge of Plaintiff's complaints and/or protests.

232.   As a direct result of Plaintiff raising complaints, Defendants took retaliatory action against Plaintiff by issuing the Final Written Warning and terminating her employment.

233.   Defendants are vicariously, strictly, and/or directly liable to Plaintiff for an unsafe and hostile work environment in violation of CEPA, pursuant to N.J.S.A. 34:19-1, et seq.

234.   As a proximate result of the aforementioned acts and omissions set forth herein, Plaintiff has sustained damages.

**WHEREFORE**, Plaintiff demands judgment in her favor and against Defendants on this Count, together with compensatory and equitable relief, all remedies available under CEPA, punitive damages, pre-and post-judgment interest, attorney's fees and costs of suit, and for such other relief that the Court deems equitable and just.

## <u>COUNT SIX</u>

## <u>VIOLATION OF THE AMERICANS WITH DISABILITIES ACT – FAILURE TO ACCOMMODATE, DISCRIMINATION AND RETALIATION</u><br><u>(Against All Corporate Defendants)</u>

235.    Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

236.    Corporate Defendants at all times relevant hereto, employs fifteen (15) or more employees.

237.    The ADA requires that employers provide reasonable accommodations for the disabled.

238.    Plaintiff at all times relevant hereto, was possessed of the requisite skill, experience, education, and other job-related requirements of her employment position with Corporate Defendants.

239.    Plaintiff could perform the essential functions of her employment position while working for Corporate Defendants.

240.    Defendants discriminated against Plaintiff by interfering with the reasonable accommodation requested in violation of the ADA.

241.    It is the duty of an employer to engage a qualified employee in good faith in an inter-active process to determine if a reasonable accommodation can be accorded a disabled employee without resulting in undue prejudice to the employer.

242.    Defendants discriminated against Plaintiff by failing to engage her in good faith in an interactive process to determine if continued work-from-home arrangements was reasonable.  Instead, Defendants unlawfully terminated Plaintiff's employment.

243.   The ADA prohibits employers from retaliating against an employee for requesting an accommodation.

244.   Defendants pretextually terminated Plaintiff's employment as a result of Plaintiff's request for an accommodation.

245.   The ADA prohibits employers from discrimination against an employee on the basis of the employee's disability.

246.   Defendants pretextually terminated Plaintiff's employment as a result of Plaintiff's disability.

247.   As a direct and proximate cause of the Defendants' unlawful acts and omissions as previously mentioned, Plaintiff has been discharged from her position of employment with Corporate Defendants.

248.   Because of the unlawful actions undertaken by Defendants, jointly or severally, Plaintiff has been and continues to suffer economic losses and pecuniary damage in the form of lost income and benefits past, present and future, and suffer unprovided medical coverage for her and her family and incur unpaid medical bills.

**WHEREFORE,** Plaintiff demands judgment against Defendants, jointly or severally, for damages equal to wages, salary, employment benefits, or other compensation denied or lost, plus liquidated damages, interest, and costs of suit.

## <u>COUNT SEVEN</u>

## TITLE VII – DISCRIMINATION, HOSTILE WORK ENVIRONMENT, & DISPARATE TRETAMENT DUE TO RELIGION AND/OR NATIONAL ORIGIN
### (Against All Corporate Defendants)

249.   Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

250.   The acts, failures to act, and conduct of Defendants set forth above constitute unlawful discrimination on the basis of religion and/or national origin in violation of Plaintiff's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq.

251.   Said violations were intentional and willful.

**WHEREFORE**, Plaintiff, respectfully demands judgment in her favor and against Defendants, and seeks all appropriate remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended, including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## COUNT EIGHT

## TITLE VII – RETALIATION
### (Against All Corporate Defendants)

252.   Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

253.   The acts, failures to act, and conduct of Defendants set forth above constitute retaliation against Plaintiff for exercising her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended.

254.   Defendants retaliated against Plaintiff for engaging in protected activities, namely, for complaining and protesting ongoing discrimination, harassment, and retaliation.

255.   Defendants, by and through its employees, retaliated against Plaintiff for having exercised her rights under federal and state law.

256.   Said violations were intentional and willful.

**WHEREFORE**, Plaintiff respectfully demands judgment in her favor and against Defendants and seeks all appropriate remedies under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq., as amended, including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## COUNT NINE

## PHRA – DISCRIMINATION & HOSTILE WORK ENVIRONMENT DUE TO RELIGION, NATIONAL ORIGIN, AND DISABILITY
### (Against All Defendants)

257.   Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

258.   The acts, failures to act, and conduct of Defendants set forth above constitute unlawful discrimination on the basis religion, national origin, and disability in violation of Plaintiff's rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

259.   The acts, failures to act, and conduct of Defendants set forth above constitute a hostile work environment on the basis religion, national origin, and disability in violation of Plaintiff's rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

260.   Said violations were intentional and willful.

**WHEREFORE**, Plaintiff, respectfully demands judgment in her favor and against Defendants, and seeks all appropriate remedies under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## COUNT TEN

## PHRA – RETALIATION
### (Against All Defendants)

261.   Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

262. The acts, failures to act, and conduct of Defendants set forth above constitute retaliation against Plaintiff for exercising her rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963.

263. Defendants retaliated against Plaintiff for engaging in protected activities, namely, for complaining and protesting ongoing discrimination, harassment, and retaliation.

264. Defendants, by and through its employees, retaliated against Plaintiff for having exercised her rights under federal and state law.

265. Said violations were intentional and willful.

**WHEREFORE**, Plaintiff respectfully demands judgment in her favor and against Defendants and seeks all appropriate remedies under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## COUNT ELEVEN

## PENNSYLVANIA WHISTLEBLOWER LAW – RETALIATION
### (Against All Corporate Defendants)

266. Plaintiff repeats each and every allegation set forth above as if set forth fully herein at length.

267.   The acts, failures to act, and conduct of Defendants set forth above constitute retaliation against Plaintiff for exercising her rights under the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421 et seq.

268.   Defendants retaliated against Plaintiff for engaging in protected activities, namely, for complaining of unlawful and unethical business practices in the workplace.

269.   Defendants, by and through its employees, retaliated against Plaintiff for having exercised her rights under federal and state law.

270.   Said violations were intentional and willful.

**WHEREFORE**, Plaintiff respectfully demands judgment in her favor and against Defendants and seeks all appropriate remedies under the Pennsylvania Whistleblower Law, 43 P.S. §§ 1421 et seq., including compensatory and punitive damages, declaratory and injunctive relief, interest, costs (including expert witness fees), liquidated damages, negative tax consequence damages, attorney's fees and such other relief as the Court shall deem appropriate.

## <u>DEMAND FOR TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial.

## <u>CERTIFICATION</u>

It is hereby certified pursuant to 28 U.S.C. § 1746 and pursuant to L.Civ.R. 11.2 that

the matter in controversy is not presently the subject of any other action pending in any court or of an arbitration proceeding to date.

Dated: March 28, 2025              */s/ Matthew A. Luber*
                                   Matthew A. Luber, Esq. (NJ ID No. 017302010)
                                   William L. Carr, Esq. (NJ ID No. 014112005)
                                   Jaclyn A. Kelly, Esq. (NJ ID No. 406252022)
                                   McOMBER McOMBER & LUBER, P.C.
                                   50 Lake Center Drive, Suite 400
                                   Marlton, NJ 08053
                                   (856) 985-9800
                                   mal@njlegal.com
                                   wlc@njlegal.com
                                   jak@njlegal.com
                                   *Attorneys for Plaintiff*