[ECF No. 43]

**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

|  |  |
|---|---|
| **INNA KHARTCHENKO,**<br><br>            **Plaintiff,**<br><br>   **v.**<br><br>**THE AMERICAN ONCOLOGIC HOSPITAL, INC., et al.,**<br><br>         **Defendants.** | **Civil No. 23-23043 (ESK/EAP)** |

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on Plaintiff Inna Khartchenko's Motion for Leave to File a Second Amended Complaint, ECF No. 43 ("Pl.'s Mot."). Defendants, the American Oncologic Hospital, Inc. ("AOH"), the Institute for Cancer Research (named as Fox Chase Cancer Center) ("FCCC"), and Temple University Health System, Inc. ("TUHS") (collectively, the "Corporate Defendants"), together with individual Defendants Sangeeta Bardhan Cook, John Lasky, Amber Medlin, and Jerome Maddox (all Defendants collectively, "Defendants") have opposed the Motion, ECF No. 47 ("Defs.' Opp."). Plaintiff filed a reply brief in support of her Motion, ECF No. 48 ("Pl.'s Reply"). The Court has reviewed the parties' submissions and decides this matter without oral argument pursuant to Federal Rule of Civil Procedure 78(b) and Local Civil Rule 78.1. For the following reasons, the motion is **GRANTED IN PART and DENIED IN PART**.

## FACTUAL BACKGROUND[1]

### A.     The Parties

Established in 1904, Defendant AOH was one of the nation's first cancer hospitals.   ECF No. 1-3 (First Am. Compl. ("FAC")) ¶¶ 14. In 1974, AOH joined with the Institute for Cancer Research and formed FCCC.  *Id.* ¶ 15.  In 2012, FCCC became part of TUHS. *Id.* ¶ 16. Since then, the Corporate Defendants have operated as joint entities to service patients throughout the Greater Philadelphia region and South Jersey.  *Id.* ¶¶ 17-18.

Plaintiff Inna Khartchenko is an immigrant of Russian and Ukrainian origin.  *Id.* ¶ 22.  She began her employment with the Corporate Defendants in 2007 as the Associate Director of Business Development, and in 2015, she was promoted to the Director of Technology Transfer.  *Id.* ¶¶ 19-20. In 2018, the Corporate Defendants expanded Plaintiff's responsibilities to include the New Ventures programs.  *Id.* ¶ 21.  According to the FAC, Plaintiff's employment was without issue until she (1) complained of discriminatory comments made by her direct supervisor, Defendant Sangeeta Bardhan Cook, the Chief Innovation Officer for FCCC and Senior Vice President of Commercialization Strategy and Business Development for TUHS; (2) reported Cook for retaliating against her by attempting to deny her a necessary medical accommodation; and (3) objected to Defendants' business dealings with a Russian company.  *Id.* ¶¶ 7, 30.

### B.     Defendant Cook's Alleged Pattern of Discriminatory Conduct and Retaliation

Defendant Cook began her employment with the Corporate Defendants in August 2022.  *Id.* ¶ 36.  On October 27, 2022, Cook sent a Microsoft Teams message to Plaintiff about Robert Uzzo,

---

[1]   The following facts are taken from the First Amended Complaint.  Because Federal Rule of Civil Procedure 12(b)(6) governs the assessment of a proposed amended complaint's futility, all allegations in the First Amended Complaint and Proposed Second Amended Complaint must be accepted as true.  *See Cox v. Money Source, Inc.*, No. 23-20880, 2025 WL 1621984, at *2 (D.N.J. June 9, 2025).

Corporate Defendants' President and Chief Executive Officer, and Jonathan Chernoff, Cancer Center Director, remarking that Uzzo and Chernoff were "two white guys" who only cared about samples from underrepresented patient populations because the National Cancer Institute "forced them" to care.  *Id.* ¶¶ 39-40.

According to the First Amended Complaint, over the next several months, Cook made additional comments that Plaintiff found offensive, many of which were of an antisemitic nature. *Id.* ¶¶ 44-47.  For example, during a December 2022 one-on-one meeting, Cook mentioned Corporate Defendants' Professor Edna Cukierman, and allegedly asked Plaintiff, "Do you know which PI is the biggest manipulator?  It is Eti [Cukierman].  She can play people in such a way that they would not even notice.  When I was listening to her at some meetings, I thought that my ex Jewish boyfriends would behave in exactly the same way."  *Id.* ¶ 45.  Plaintiff objected to Cook's comments, explaining that many of her friends are Jewish and that she grew up with Jewish students and teachers.  *Id.* ¶ 49.  Plaintiff further alleges that Cook's alleged antisemitism "especially offended" her because her grandmother's parents and young siblings lost their lives in the Holocaust. *Id.* ¶ 50.  Beyond the antisemitic comments, Plaintiff claims that Cook also regularly made harassing comments about many of Plaintiff's colleagues, some of which Plaintiff believed showed that Cook had a pattern of discriminating against persons with disabilities.  *Id.* ¶¶ 51-56.

In November 2022, Plaintiff went to the emergency room for abdominal pain.  *Id.* ¶ 58. Plaintiff subsequently reported to Cook that she was scheduled for surgery on January 9, 2023.  *Id.* ¶ 59.  Although Cook suggested that Plaintiff could take Family and Medical Leave Act ("FMLA") leave, Plaintiff opted to continue her previous remote work arrangement[2] and work throughout her recovery, with sick time taken only as needed.  *Id.* ¶¶ 60-70.

---

[2]  According to the FAC, since 2013, Plaintiff had been working a remote hybrid schedule, which was converted to a fully remote schedule at the start of the COVID-19 pandemic.  *Id.* ¶ 61.

Between January 12, 2023, and January 27, 2023, Plaintiff worked remotely while using approximately two sick days per week. *Id.* ¶ 71. During this time, Plaintiff claims to have recognized a change in Cook's behavior toward her. *Id.* ¶ 72. According to Plaintiff, Cook began to heavily scrutinize Plaintiff's work. *Id.* ¶¶ 73-74. On January 23, 2023, Plaintiff reported Cook's alleged pattern of discriminatory behavior—focusing on Cook's alleged antisemitic comments and increased scrutiny of Plaintiff's work after her surgery—to Cancer Center Director Jonathan Chernoff. *Id.* ¶¶ 75-77. Just days later, on January 28, 2023, Cook informed Plaintiff that she had to retroactively use FMLA leave for her sick days after her surgery and that she could not work until she presented a physician's clearance note. *Id.* ¶ 78.

On January 30, 2023, Cook allegedly began to target Plaintiff's remote work arrangement and presented Plaintiff with an accommodation form for her physician to sign in order to remain working from home. *Id.* ¶¶ 80-81. On February 2, 2023, prior to a meeting with Defendant Amber Medlin, Senior Human Resources Business Partner, about her accommodation request, Plaintiff sent a lengthy complaint via email about Cook and her alleged discriminatory remarks and retaliatory behavior. *Id.* ¶¶ 9, 85. That email detailed Plaintiff's various complaints of Cook's retaliation, including alleged discriminatory remarks, criticism of senior administration and investigators, and efforts to remove Plaintiff's ability to work from home. *Id.* ¶ 85. Based on that email, Plaintiff alleges that the "Corporate Defendants purported to investigate [her] complaints and interviewed [her] on February 15, 2023, via Zoom from her home office in New Jersey." *Id.* ¶ 86. Although the Corporate Defendants approved Plaintiff's accommodation request through May 13, 2023, Plaintiff believed that Cook was "beginning the process to revoke Plaintiff's remote work arrangement." *Id.* ¶ 87. During the investigation period, Plaintiff alleges that she suffered stress that contributed to complications from her surgery. *Id.* ¶¶ 88-89. In the wake of the investigation, Cook allegedly

criticized Plaintiff publicly, micromanaged her, made her look incompetent, and excluded her from important meetings.  *Id.* ¶ 90.

On April 14, 2023, despite knowing about Plaintiff's remote work accommodation due to her disability, Cook allegedly informed Plaintiff that she had to be on site three days per week beginning on May 1, 2023, because of her "director-level" position.  *Id.* ¶ 92.  Cook also instructed Plaintiff to write a return-to-office plan for her team, even though the Corporate Defendants eliminated her team's office space in March 2022.  *Id.* ¶ 93.  Plaintiff objected to Cook's plans to revoke her remote work arrangement for multiple reasons, but Cook allegedly refused to consider Plaintiff's objections.  *Id.* ¶¶ 94-95.

**C.**     **Plaintiff's Whistleblower Complaints Regarding the Corporate Defendants' Business Affiliations**

Meanwhile, on March 28, 2023, Plaintiff participated in a Zoom meeting with Cook and Tatiana Venkova, the Corporate Defendants' Licensing Associate.  *Id.* ¶ 99.  Cook informed Plaintiff that, because Plaintiff spoke Russian, she needed her help negotiating with a Russian company ("Russian Company") that held the rights to a promising anti-cancer drug.  *Id.* ¶¶ 100-01.  Plaintiff claims that she was immediately apprehensive about working on this project due to her Ukrainian heritage and the ongoing conflict between Russia and the Ukraine, and she worried that the Corporate Defendants' affiliations with the Russian Company could pose serious ethical and legal problems for the Corporate Defendants.[3]  *Id.* ¶¶ 104-06.

According to the First Amended Complaint, Plaintiff conducted approximately thirty minutes of research of publicly-available information and discovered that the Russian Company was owned by the Russian Venture Company—part of the Russian Direct Investment Fund—that had

---

[3]   According to Plaintiff, "the revenues generated by the Russian Direct Investment Fund, and thus the Russian Company, would directly support Russia's invasion of Ukraine."  *Id.* ¶ 115.

direct ties to the Russian government and that the United States had sanctioned for violations of international law. *Id.* ¶¶ 107-09. Based on this research, Plaintiff believed that the Corporate Defendants' plans to acquire the intellectual property covering the drug carried a substantial risk of adverse consequences. *Id.* ¶ 110-11.

Plaintiff raised her concerns with Cook, stating that proceeding with the deal would directly violate President Biden's Executive Orders imposing Russia-related sanctions. *Id.* ¶¶ 112-13. Plaintiff also objected to the business dealing as highly unethical. *Id.* ¶ 114.

On April 11, 2023, Defendant Jerome Maddox, Corporate Defendants' General Counsel, emailed Plaintiff and Cook regarding the deal. *Id.* ¶ 116. Plaintiff immediately responded that she had concerns that she would like to share with Maddox. *Id.* ¶ 118. During an April 14, 2023 Teams call with Cook and Maddox, Plaintiff reiterated her belief that it was unethical for the Corporate Defendants to negotiate a deal with a company likely financed by a sanctioned Russian entity. *Id.* ¶ 121. The next day, Plaintiff followed up by writing to Maddox, suggesting that he have law enforcement agencies check into the Russian Company. *Id.* ¶ 122. In response, Maddox called Plaintiff on April 18, 2023, and told her that the Corporate Defendants would "be okay with the PR" if the deal went forward. *Id.* ¶ 123.

Meanwhile, on April 17, 2023, Plaintiff complained to Cook, stressing that Cook was planning to give the Russian Company project to Plaintiff "without disclosing all the information and informing [her] of the concerns associated with it." *Id.* ¶ 126. Plaintiff emphasized that had she not done due diligence and shared her concerns, Cook "could have gotten [Plaintiff] involved in this project without [her] knowing all the problematic background information surrounding it," which "could have created serious problems for [her] in the future, personally and professionally." *Id.*

D.    **Alleged Retaliation**

Plaintiff claims that one day after Plaintiff's email to Cook about the Russian Company deal, and only a few days after Plaintiff complained about Cook's revocation of her remote work accommodation, the Corporate Defendants' investigation into Plaintiff's complaints from February ended. *Id.* ¶ 127. Plaintiff inquired into the results of the investigation; on April 18, 2023, Defendant John Lasky, Corporate Defendants' Executive Vice President and Chief Human Resources Officer, informed Plaintiff via email that her allegations were unfounded and "that the February investigation did not uncover anything unlawful in Cook's conduct." *Id.* ¶ 128. In response to Plaintiff's follow-up questions, Lasky reiterated that no unlawful conduct occurred. *Id.* ¶ 130.

According to the First Amended Complaint, Cook and Medlin then scheduled a Teams meeting for the following day with Plaintiff, during which they issued Plaintiff a final written warning and placed her on a performance improvement plan ("PIP"). *Id.* ¶¶ 131-32. The final written warning described Plaintiff's reports as "assuming malicious intent in others." *Id.* ¶ 134. Plaintiff alleges that when she asked Cook how she could receive a final warning if she never received any prior warnings during her fifteen years of service to the Corporate Defendants, Cook ignored her. *Id.* ¶ 135. Plaintiff asserts that during her work tenure with the Corporate Defendants, she consistently received stellar performance reviews. *Id.* ¶¶ 138–45.

On April 20, 2023, Plaintiff's counsel sent the Corporate Defendants notice of intent to file this lawsuit, and her counsel filed the complaint the following day. *Id.* ¶¶ 148-49. Over the next two months, Plaintiff was required to meet with Cook on a weekly basis as part of her PIP, and Plaintiff complained to Defendants Cook, Maddox, and Medlin that she believed these measures were retaliatory. *Id.* ¶¶ 150-51. Although Plaintiff worked long hours over the next two months to avoid termination, Cook allegedly took every opportunity to make Plaintiff's job more difficult. *Id.* ¶¶ 152-54.

On June 21, 2023, Plaintiff had her final weekly check-in meeting with Cook. *Id.* ¶ 156. According to Plaintiff, when she logged on from home, she found Cook and Medlin waiting for her. *Id.* ¶ 157. At that time, Cook terminated Plaintiff's fifteen-year employment with the Corporate Defendants based on alleged performance issues. *Id.* ¶¶ 158-59.

**PROCEDURAL HISTORY**

Plaintiff initiated suit in the New Jersey Superior Court in April 2023. ECF No. 1-1 (Compl.). Her First Amended Complaint, filed November 7, 2023, set forth five causes of action: (1) disparate treatment and discrimination due to disability under the New Jersey Law Against Discrimination ("NJLAD"), (Count One), ECF No. 1-2, FAC ¶¶ 167-83; (2) failure to accommodate and failure to engage in the interactive process under the NJLAD (Count Two), *id.* ¶¶ 184-86; (3) discrimination, hostile work environment, and disparate treatment due to religion, national origin, and/or ethnicity under the NJLAD (Count Three), *id.* ¶¶ 187-98; (4) retaliation/improper reprisal under the NJLAD (Count Four), *id.* ¶¶ 199-202; and (5) retaliation in violation of New Jersey Conscientious Employee Protection Act ("CEPA") (Count Five), *id.* ¶¶ 203-11. Defendants subsequently removed this matter to this Court and moved to dismiss. ECF Nos. 1, 5.

On November 20, 2024, the Court granted Defendants' motion finding that Plaintiff's claims under NJLAD and CEPA were "only applicable to situations in which the state of employment is New Jersey or where the plaintiff has significant employment responsibilities in New Jersey." ECF No. 30 (Op. & Order) at 3, ¶ 8 (cleaned up). The Opinion noted that "[b]eyond defendants having authorized plaintiff to work from her home in New Jersey for her own convenience, plaintiff fails to establish that defendants conducted any business in New Jersey or targeted New Jersey in any purposeful way." *Id.* at 4, ¶ 9. Because Plaintiff had failed to allege that she had any job responsibilities outside Defendants' Pennsylvania offices, the Court determined that Plaintiff had presented no basis to assert New Jersey law. *Id.* Accordingly, the Court dismissed the First

Amended Complaint without prejudice and granted Plaintiff leave to amend to "cur[e] the deficiencies addressed" in the Court's opinion and order. *Id.* at 5, ¶ 2.

On December 17, 2024, Plaintiff filed a proposed Second Amended Complaint, ECF. No. 31 (Second Am. Compl.), that went beyond the Court's order to cure the FAC's deficiencies. Plaintiff asserted additional federal and Pennsylvania state law claims and re-asserted the previously-dismissed New Jersey state law claims. Defendants sought leave to file a motion to dismiss. ECF No. 35 (Jan. 30, 2025 Ltr.). The Court held a pre-motion conference, after which the Court directed Plaintiff to file a motion for leave to amend. ECF No. 41 (Order). On March 28, 2025, Plaintiff filed the current Motion for Leave to File a Second Amended Complaint. ECF No. 43 ("Pl.'s Mot."). Defendants have opposed the Motion, ECF No. 47 ("Defs.' Opp."), and Plaintiff have filed a reply brief, ECF No. 48 ("Pl.'s Reply"). This Motion is now ripe for disposition.

## STANDARD OF REVIEW

Rule 15(a) governs amendments to pleadings before trial. A party may amend its pleading once as a matter of course within either twenty-one days after serving it; or if the pleading is one to which a responsive pleading is required, the earlier of twenty-one days after service of a responsive pleading or twenty-one days after a motion under Rule 12(b), (e), or (f). Fed. R. Civ. P. 15(a)(1). If those deadlines have expired, a party may amend its pleading only with the opposing party's written consent or the court's leave. Fed. R. Civ. 15(a)(2). "The court should freely give leave when justice so requires." *Id*.

The Third Circuit has adopted a liberal approach to the amendment of pleadings. *Spartan Concrete Prods., LLC v. Argos USVI, Corp.*, 929 F.3d 107, 115 (3d Cir. 2019); *see also Donovan v. W. R. Berkley Corp.*, 566 F. Supp. 3d 224, 229 (D.N.J. 2021) ("Generally, there is a presumption in allowing the moving party to amend its pleadings."). However, the Court may deny a motion for leave to amend in one of four instances: (1) the amendment would be futile; (2) the moving party

has demonstrated undue delay, bad faith, or dilatory motives; (3) the amendment would prejudice the non-moving party; or (4) the moving party was put on notice of deficiencies in its pleading but chose not to resolve them. *U.S. ex rel. Schumann v. AstraZeneca Pharms. L.P.,* 769 F.3d 837, 849 (3d Cir. 2014) (quotations omitted). Ultimately, the decision of whether to grant leave to amend lies within the sound discretion of the court. *Arab Afr. Int'l Bank v. Epstein*, 10 F.3d 168, 174 (3d Cir. 1993).

## DISCUSSION

Plaintiff makes three sets of changes in the proposed Second Amended Complaint ("Proposed SAC"). First, Plaintiff adds allegations in an effort to establish that New Jersey law applies here based on her employment responsibilities and work from her home office in New Jersey. *See* Pl.'s Mot. 17. Plaintiff alleges that the Corporate Defendants have longstanding contacts with New Jersey because they partner with New Jersey-based hospitals to provide services to New Jersey patients. *See generally* Proposed SAC ¶¶ 27-31. Moreover, Plaintiff claims that throughout Plaintiff's employment, "she conducted business in New Jersey on behalf of [the] Corporate Defendants working in New Jersey on numerous projects with New Jersey-based entities[.]" *Id.* ¶ 41; *see also id.* ¶¶ 42-45.

Second, Plaintiff seeks to add claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. §§ 951-63, and the Pennsylvania Whistleblower Law ("PWL"), 43 Pa. Stat. §§ 1421-28. Proposed SAC at 3 & ¶¶ 235-48. Plaintiff alleges that on March 27, 2024, she filed three charges of discrimination against the Corporate Defendants with the Equal Employment Opportunity Commission ("EEOC") and cross-filed with the Pennsylvania Human Relations Commission. *Id.* ¶ 19. On November 21, 2024, the EEOC issued Plaintiff a Notice of Right to Sue for her charges of discrimination. *Id.* ¶ 20.

Finally, Plaintiff asserts that she "has recently learned of additional allegations supporting her claims of discrimination and retaliation."  Pl.'s Mot. 20.  Specifically, on February 13, 2025, Plaintiff's counsel allegedly "received a detailed 'anonymous' tip—which upon information and belief came from an employee within or connected to the Defendants—that specifically addresses Defendant Cook's discriminatory and retaliatory conduct."  *Id.*  As such, Plaintiff seeks to add factual allegations against Defendant Cook.  Proposed SAC ¶¶ 178-83.

Defendants oppose these amendments on several grounds.  Primarily, Defendants argue that Plaintiff's new factual allegations do not cure the deficiencies in her dismissed CEPA or NJLAD claims.  Defs.' Opp. at 4, 28-29.  Moreover, they assert that Plaintiff should be barred from amending and adding claims under Title VII, the ADA, and the PHRA because: (1) she failed to exhaust administrative remedies as to these claims, *id.* at 4, 6-11; and (2) her national origin, ethnicity, and religious discrimination claims are futile, *id.* at 4, 11-21.  Finally, Defendants argue that Plaintiff's new PWL claim is untimely and futile.  *Id.* at 4-5, 21-28.

The Court addresses each of Defendants' arguments in turn.

## A.    <u>New Factual Allegations in Support of Dismissed CEPA and NJLAD Claims</u>

Plaintiff's First Amended Complaint originally pled claims under the NJLAD and CEPA. The Court dismissed those claims because New Jersey was not Plaintiff's state of employment with Defendants and thus, those statutes were inapplicable.  ECF No. 30 (Op. & Order) at 3-4, ¶¶ 8-9. Specifically, the Court noted that, regardless of where a plaintiff resides, CEPA and NJLAD apply only when New Jersey is an employee's state of employment or when the plaintiff has significant employment responsibilities in New Jersey.  *Id.* at 3, ¶ 8.  The Court found that Plaintiff was primarily a Pennsylvania employee.  *Id.* at 4, ¶ 9.  In so doing, however, the Court granted Plaintiff leave to file a second amended complaint curing these deficiencies.  *Id.* at 5, ¶ 2.

Plaintiff now seeks to add various allegations to establish that New Jersey constitutes her place of employment, thereby allowing her to proceed with her CEPA and NJLAD claims.  Pl.'s Mot. 17-19.  In analyzing the propriety of these new allegations, the Court notes that "New Jersey law does not regulate conduct outside the state." *D'Agostino v. Johnson & Johnson, Inc.*, 133 N.J. 516, 539 (1993).  "New Jersey courts have consistently applied the law of the state of employment to claims of workplace discrimination and, therefore, only apply the NJLAD if the claimant was employed in New Jersey." *McGovern v. Sw. Airlines*, 12-3579, 2013 WL 135128, at *1 (D.N.J. Jan. 8, 2013) (citing cases); *see also Norris v. Harte-Hanks, Inc.*, 122 F. App'x 566, 569 (3d Cir. 2004) (applying state of employment test to CEPA claim).  "The rationale . . . is to protect employers from the potential unfairness of having to comply with several different legal regimes merely because they may have employees that reside in different states." *McGovern*, 2013 WL 135128, at *2 (citation omitted).  Thus, looking to the state of employment "'ensures that the law in the jurisdiction with the strongest interest in the outcome of the litigation controls.'" *McGovern*, 2013 WL 135128, at *2 (quoting *Weinberg v. Interep Corp.*, No. 05-5458, 2006 WL 1096908, at *7 (D.N.J. Apr. 26, 2006)).

The key inquiry focuses on the situs of the individual's employment.  *Lee v. United Airlines, Inc.*, No. 18-14772, 2021 WL 2679891, at *4 (D.N.J. June 29, 2021).  "New Jersey is an individual's place of employment if New Jersey has 'a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair.'" *Shah v. Am. Airlines*, No. 17-6298, 2022 WL 3098087, at *6 (D.N.J. Aug. 4, 2022) (quoting *Satz v. Taipina*, No. 01-5921, 2003 WL 22207205, at *15 (D.N.J. Apr. 15, 2023) (further citations omitted)).  "In that respect, '[m]ere, occasional contact with New Jersey as part of a plaintiff's employment is insufficient to turn those visits into plaintiff being based in New Jersey for employment purposes.'" *Id.* (quoting *Lee*, 2021 WL 2679891, at *4).  "In other words, 'it is where Plaintiff worked, rather

than where Defendant was located or where Plaintiff occasionally traveled to for business, that is significant.'" *Id.* (quoting *Mirabella v. Oasis Foods Co.*, No. 12-6218, 2014 WL 7272955, at *4 (D.N.J. Dec. 16, 2014)).  An exception to this rule includes where an employee of an out-of-state employer has "non-trivial employment responsibilities in New Jersey."  *McGovern*, 2013 WL 135128, at *2.  "Essentially, [however], there are no cases applying the NJLAD to out-of-state employers unless the Plaintiff has significant employment responsibilities in New Jersey."  *Id.*

Here, the Court previously found that Plaintiff had not established that her place of employment was New Jersey, reasoning as follows:

> Beyond defendants having authorized plaintiff to work from her home in New Jersey for her own convenience, plaintiff fails to establish that defendants conducted any business in New Jersey or targeted New Jersey in any purposeful way. . . . Plaintiff was exclusively hired to work in Pennsylvania, and her promotion was offered and accepted through the same office. . . . While plaintiff may have worked remotely for a significant portion of her approximately 15-year employment with the Corporate Defendants, defendants attempted in April 2023 to have plaintiff return to working on-site in Pennsylvania. . . . Plaintiff fails to indicate that she had any responsibilities outside of the Corporate Defendants' Pennsylvania offices. . . . Therefore, plaintiff presents no basis to assert New Jersey law and a choice of law assessment is unnecessary.

ECF No. 30 (Op. & Order) ¶ 9.

Plaintiff now seeks to add the following allegations designed to establish the applicability of New Jersey law:

> 27.    Approximately 20% of Corporate Defendants' patients are New Jersey residents, and, as of March 2024, Defendant FCCC has opened a location in Voorhees, New Jersey, where they are equipped to treat a wide range of patients [footnote omitted].

> 28.    Corporate Defendants permanently expanded their operations into New Jersey to "reinforce Fox Chase's commitment to providing top-tier cancer care to the South Jersey Community." [footnote omitted].

29.    Indeed, Corporate Defendants have longstanding contacts with New Jersey as they partner with New Jersey based hospitals to provide services to their New Jersey patients. [footnote omitted].

30.    Upon information and belief, Corporate Defendants receive Medicaid funding through federal and state governments.  Indeed, approximately 45% of Corporate Defendants' patients are covered by Medicaid, and 87% of Corporate Defendants' discharges are Medicaid and Medicare patients. [footnote omitted].

31.    Furthermore, upon information and belief, Corporate Defendants received substantial additional funding from the Commonwealth of Pennsylvania and from the federal government [footnote omitted].

. . . .

40.    Plaintiff was expected to conduct her regular duties and maintain her productivity from her home in New Jersey, while also paying New Jersey income taxes.

41.    In fact, throughout Plaintiff's employment, she conducted business in New Jersey on behalf of Corporate Defendants working in New Jersey on numerous projects with New Jersey-based entities, including but not limited to Princeton University, Rutgers University, I-Corps Northeast, BioNJ, New Jersey Technology Council, Bristol Myers Squibb, Daiichi Sankyo, and other biotech companies and life science organizations. [footnote omitted].

42.    In addition, Plaintiff worked extensively with Genesis Drug Discovery & Development, a New Jersey-based biotechnology company.

43.    Genesis Drug Discovery & Development purchased a controlling interest in NexusPharma, a startup company in which Fox Chase Cancer Center held equity. [footnote omitted].

44.    During and following the acquisition of NexusPharma by Genesis Discovery & Development, Plaintiff spent as much as 50% of her time performing due diligence and negotiating various agreements on behalf of Corporate Defendants related to that New Jersey company.

45.    Throughout her employment, Plaintiff was encouraged to attend events and meetings in New Jersey with companies that Corporate Defendants contracted and were affiliated with in order to effectuate her job responsibilities.

Proposed SAC ¶¶ 28-31, 40-45.

Such allegations—while perhaps relevant to this Court's undisputed personal jurisdiction over the Corporate Defendants—do not cure the deficiencies identified by the Court. Proposed SAC ¶¶ 3-4. Despite Defendants' efforts to expand business connections into New Jersey, at all relevant times, they remained based in Pennsylvania. The Pennsylvania office hired Plaintiff, and the Proposed SAC contains no allegations that her pay stubs or tax returns issued from anywhere but that office. Although Plaintiff worked at home for significant portions of her career, nothing in the Proposed SAC suggests that this arrangement was for the Corporate Defendants' benefit. *Id.* ¶¶ 39-45, 84-85. Indeed, as noted previously, Defendants actually sought to have Plaintiff return full-time to the office in Pennsylvania. *Id.* ¶¶ 98-101, 111-13. The relevant communications occurred with the Corporate Defendants' employees who were based in Pennsylvania. *See generally* Proposed SAC. And the mere fact that Plaintiff often worked with New Jersey companies does not equate to a legal showing that she was based in New Jersey for employment purposes.[4]

---

[4] Plaintiff argues that this determination is premature at this early stage, citing cases for the proposition that such a finding is better made after a period of discovery. Her cited cases, however, are inapposite because they involve a choice of law analysis under New Jersey's choice of law rules to determine which state's law governed the plaintiff's claims. *See Law v. Virtus Partners Holdings, LLC*, No. 22-2329, 2023 WL 2245039, at *4 (D.N.J. Feb. 27, 2023) (noting that "additional discovery is needed to appropriately determine which state's law should apply to [p]laintiff's claims"); *Krys v. Aaron*, 106. F. Supp. 3d 472, 481 (D.N.J. 2015) (finding that choice of law analysis was better done at a later stage of the case); *Weske v. Samsung Elecs. Am., Inc.*, No. 10-4811, 2012 WL 833003, at *2 (D.N.J. Mar. 12, 2012) (finding that a proper choice of law analysis was premature at the motion to dismiss stage); *see also Pallies v. Lenape Valley Found.*, No. 25-735, 2025 WL 968316, at *1 (E.D. Pa. Mar. 31, 2025) (finding that because the complaint was "rather vague as to where all the relevant underlying events took place," the court could not make a determination as to whether the New Jersey law applied to the workplace discrimination case before it). Here, by contrast, the question is whether Plaintiff may bring certain claims under New Jersey law based on her place of employment. Given the detailed allegations in the Proposed SAC, the Court has sufficient information before it to make this determination.

In light of the foregoing, any new allegations regarding the Corporate Defendants' New Jersey connections fail to cure the deficiencies undergirding the Court's previous dismissal of Plaintiff's NJLAD and CEPA claims. Because such claims would be futile, the Court denies Plaintiff leave to amend.

**B.** **Failure to Exhaust Administrative Remedies for Title VII, ADA, and PHRA Claims**

Defendants next argue that leave to amend the complaint to add claims under Title VII, the ADA, and the PHRA should be denied as futile because Plaintiff failed to exhaust administrative remedies. Defs.' Opp. at 6-11.

A Title VII plaintiff must exhaust all administrative remedies before bringing a claim for judicial relief. 42 U.S.C. § 2000e-5(e)(1); *Antol v. Perry*, 82 F.3d 1291, 1295 (3d. Cir. 1996). This standard requires the Plaintiff to "'fil[e] a timely discrimination charge with the EEOC.'" *Cummings v. Princeton Univ.*, No. 15-8587, 2016 WL 6434561, at *3 (D.N.J. Oct. 31, 2016) (quoting *Barzanty v. Verizon Pa., Inc.*, 361 F. App'x 411, 413-14 (3d Cir. 2010)).[5] "Only after the EEOC action is filed, an investigation is completed, and a right to sue letter is issued can a plaintiff be considered to have exhausted her administrative remedies." *Tzeng v. Care One at Madison Ave., LLC*, No. 23-3011, 2024 WL 3812070, at *2 (D.N.J. Aug. 14, 2024) (citing *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001)). The purpose of this requirement is "(1) to ensure 'that an employer is made aware of the complaint lodged against him and is given

---

[5] Title I of the ADA incorporates the administrative procedures of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5. *See* 42 U.S.C. § 12117; *Churchill v. Star Enters.*, 183 F.3d 184, 190 (3d Cir. 1999). Thus, a plaintiff alleging a Title I violation must first exhaust administrative remedies before filing an action in court. *See* 42 U.S.C. §§ 2000e-5(e), (f)(1); *see also Khalil v. Rohm & Hasas Co.*, No. 05-3396, 2005 WL 3111791, at *2 (E.D. Pa. Nov. 18, 2005). Similarly, as a precondition to suit under the PHRA, a plaintiff must exhaust their claims by presenting them to the Pennsylvania Human Relations Commission ("PHRC"). *See Antol*, 82 F.3d at 1295-96; *Nerosa v. Storecast Merch. Corp.*, No. 02-440, 2002 WL 1998181, at *3 (E.D. Pa. Aug. 28, 2002).

the opportunity to take remedial action,' and (2) to give 'the EEOC the opportunity to fulfill its statutory duties of eliminating unlawful practices through the administrative process.'" *O'Donnell v. Michaels' Family Rest., Inc.*, No. 07-5386, 2008 WL 2655565, at *2 (E.D. Pa. July 1, 2008) (quoting *Jackson v. J. Legis Crozer Library*, No. 07-481, 2007 WL 2407102, at *5 (E.D. Pa. Aug. 2, 2007)). As a general rule, the exhaustion requirement is "strictly construed and the failure to pursue the appropriate administrative remedies will bar judicial review." *Elberson v. Pennsylvania*, 396 F. App'x 819, 821-22 (3d. Cir. 2010).

An EEOC charge form "serves to define the scope of the Commission's investigation and to notify the defendant of the charges against it." *Barzanty*, 361 F. App'x at 415 (citing 42 U.S.C. § 2000e-5(b)). Once a charge is filed with the EEOC, "the scope of a resulting private civil action in the district court is 'defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Hicks v. ABT Assocs., Inc.*, 572 F.2d 960, 966 (3d Cir. 1978) (quoting *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 398-99 (3d Cir. 1976)).

The Third Circuit has emphasized that "the failure of the EEOC to give notice of a charge to the employer involved or its failure to attempt reconciliation, both of which are required by section 706(b) of Title VII, 42 U.S.C. § 2000e-5(b), does not bar a civil suit by the charging party." *Hicks*, 572 F.2d at 964 (citations omitted). This holding is "based on the concept that, once the Commission has been given its chance to reconcile the parties informally, the individual's right to bring a civil action becomes an indispensable part of the enforcement scheme of Title VII. This right should not be defeated by the EEOC's failure to comply with its statutory obligations." *Id.* (citations omitted). Thus, "[w]hile it is a well-established tenet of administrative law that a Title VII or ADA plaintiff must exhaust his administrative remedies before seeking judicial relief, it is equally well-established that such a plaintiff is also 'not charged with the [EEOC's] failure to perform its statutory duties.'" *Evans v. Maax-KSD Corp.*, No. 06-2804, 2006 WL 3488708, at *3 (E.D. Pa. Nov. 30, 2006) (quoting

*McClease v. R.R. Donnelley & Sons Co.*, 226 F. Supp. 2d 695, 704 (E.D. Pa. 2002)). "Because the statutory scheme places the responsibility on the EEOC, not a plaintiff, to issue a notice of a charge to an employer, the EEOC's failure to do so does not bar Plaintiff from seeking judicial relief." *Id.*

Here, Defendants present a two-fold exhaustion defense. They allege that Plaintiff failed to exhaust her administrative remedies as to her Title VII and ADA claims because Defendants never received notice of the filing from the EEOC. Defs.' Opp. at 6-8. Second, they assert that because Plaintiff failed to properly dual file her EEOC charge with the PHRC, her PHRA claims are not administratively exhausted. *Id.* at 8-10.

      1.    <u>Title VII and ADA Claims</u>

With respect to the Title VII and ADA claims, Defendants acknowledge Plaintiff's assertion that she filed a Charge of Discrimination with the EEOC on March 27, 2024, naming as respondents the American Oncologic Hospital, Inc., the Institute for Cancer Research, and Temple University Health System, Inc. Pl.'s Mot. at 26-27; ECF No. 43-5 (EEOC Charge). Defendants contend, however, that they never received notice of either the filing or the case closure. Defs.' Opp. at 7. They argue that the Dismissals and Notices of Rights to Sue, which Plaintiff attaches as Exhibit B to her December 17, 2024 Second Amended Complaint, *see* ECF No. 32-1, all show an "incident location" of 10 Arnold Drive, West Windsor, NJ 08550, which is Plaintiff's home address. Defs.' Opp at 7. Thus, even though Plaintiff had been litigating against Defendants for approximately eighteen months by the time she filed an EEOC charge, Defendants contend that Plaintiff: (a) caused the charge to be filed with a Newark, New Jersey EEOC Area Office that had "no responsibility for investigating claims against Pennsylvania employers or under the Pennsylvania Human Relations Act," and (b) failed to email a copy of the EEOC Charge to Defendants or their counsel. *Id.* at 7-8.

While Defendants may not have been given proper notice of the EEOC charge, the fault does not lie with Plaintiff. Plaintiff's March 26, 2024 EEOC Charge of Discrimination specifically lists

as respondents AOH, with a main business address of 3509 North Broad Street, Room 936, Philadelphia, Pennsylvania 19140; FCCC, with a main business address of 333 Cot[t]man Avenue, Philadelphia, Pennsylvania, 1911; and TUHS, with a main business address of 3509 North Broad Street, 9th Floor, Philadelphia, Pennsylvania 19[1]40."   ECF No. 43-5 (EEOC Charge of Discrimination).   The accompanying "E-File for Attorneys Information" reveals that Plaintiff identified each respondent at the above addresses but listed her "Worksite Address" as 10 Arnold Drive, West Windsor, New Jersey 08550.  *See* ECF No. 48-1 (E-File for TUHS); ECF No. 48-2 (E-File for The Fox Chase Cancer Center); ECF No. 48-3 (E-File for The American Oncologic Hospital).  Thereafter, the EEOC's Dismissals of Charge and Notices of Your Right to Sue dated November 21, 2024, indicated that the EEOC inexplicably sent these documents both to Plaintiff's counsel and to the "Incident Location" at 10 Arnold Drive, West Windsor, New Jersey 08550, as opposed to Defendants' listed addresses.  *See* ECF No. 32-1 (Dismissals of Charge and Notices of Your Right to Sue).

Given that the Plaintiff complied with her responsibilities, and that the lack of notice is attributable to the EEOC, Plaintiff should not now be barred from her statutory right to a civil action.[6]  Accordingly, the Court finds that Plaintiff's claims are not futile on this basis.

---

[6]   Defendants cite to *Tzeng v. Care One at Madison Ave.,* LLC, No. 23-3011, 2024 WL 3812070, at *2 (D.N.J. Aug. 14, 2024), for the proposition that claims should be dismissed where the plaintiff failed to exercise a reasonable effort to identify respondents to effectuate exhaustion of administrative remedies.  Defs.' Opp. at 8.  That case is distinguishable.  There, the plaintiff admittedly failed to specifically name two of three corporate defendants in her EEOC action.  *Tzeng*, 2024 WL 3812070, at *2.  Instead, the plaintiff named one corporate defendant and then sought to name the other two related entities in her civil action.  *Id.* at *3.  The court used the four-factor test set forth in *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 888 (3d Cir. 1977), to determine whether an unnamed party in an EEOC complaint may be sued in a civil action.  *Id.* at *4.  The Third Circuit found that, in that situation, no exception to the administrative exhaustion requirement was warranted.  *Id.*  Here, the case presents a drastically different situation.  Plaintiff explicitly named all three defendants in her EEOC charge and provided their corporate addresses.  The failure of the Corporate Defendants to receive notice of the charge came at the hands of the EEOC itself, not Plaintiff.

2.    PHRA Claims

Defendants also contend that Plaintiff failed to exhaust her PHRA claims because her EEOC Charge does not show that she properly initiated a complaint with the PHRC or requested that her EEOC Charge be dual filed with the PHRC.  Defs.' Opp. at 9.  Defendants reason that Plaintiff's EEOC Charge "fails to reveal any request that the EEOC transmit the Charge to the PHRC."  *Id.* They further contend that Plaintiff's assertion that she requested her EEOC Charge to be dual filed with the PHRC—set forth in her brief and Proposed SAC—has no support in the pleadings and "appears to be premised on nothing more than the fact that she asserted PHRA claims in her EEOC Charge."  *Id.* at 10.

Plaintiff responds that her EEOC Charge "identifies each of her claims under the PHRA in the count section, which undeniably evinces 'an intent to file a PHRC charge in the documents filed with the EEOC.'"  Pl.'s Reply at 4 (quoting *Koch v. Early Impressions Learning Ctr., LLC*, No. 24-549, 2024 U.S. Dist. LEXIS 192312, at *10 (M.D. Pa. Oct. 23, 2024)).  Moreover, according to Plaintiff, her EEOC Charge clearly indicated that she sought to recover all damages and remedies available to her under federal and Pennsylvania law.  *Id.* at 5.

The Court agrees with Defendants.  "To bring suit under the PHRA, an administrative complaint must first be filed with the PHRC within 180 days of the alleged act of discrimination." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 164 (3d Cir. 2013) (citing 43 Pa. Stat. § 959(h)). "If a plaintiff fails to file a timely complaint with the PHRC, then he or she is precluded from judicial remedies under the PHRA."  *Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 535 (W.D. Pa. 2010) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997)).

The PHRC and the EEOC have entered into a work-share agreement whereby each agency waives the right to initially review claims that are first filed with the other agency.  *See Colbert v. Mercy Behav. Health*, 845 F. Supp. 2d 633, 638 & n.3 (W.D. Pa. 2012).  A claimant, however, may

not rely on the work-share agreement to satisfy all of the PHRA requirements to be entitled to the relief available under the PHRA. *See Woodson*, 109 F.3d at 927 (holding that "filing with the EEOC does not function as a filing for PHRA purposes"). Thus, a claimant must show that the PHRC actually received the complaint. *Id.*; *Lantz v. Hosp. of Univ. of Pa.*, No. 96-2671, 1996 WL 442795, at *3 (E.D. Pa. July 30, 1996) (citations omitted). A claimant "will generally satisfy the requirements of both agencies where he or she files a charge of discrimination with one agency *and instructs that agency to dual file with the other.*" *Todora v. Neshannock Twp. Sch. Dist.*, No. 16-647, 2016 WL 6433163, at *3 (W.D. Pa. Oct. 31, 2016) (emphasis in original) (citing *Evans v. Gordon Food Servs.*, No. 14-1242, 2015 WL 4566817, at *3 (M.D. Pa. July 29, 2015)); *see also Rhoades v. Young Women's Christian Ass'n of Greater Pittsburgh,* No. 09-1548, 2010 WL 4668469, *5 (W.D. Pa. Nov. 9, 2010) ("Courts in this Circuit interpreting the worksharing arrangement have held that where a plaintiff timely files a complaint with one agency, either the EEOC or the PHRC, coupled with a request for dual filing, then the complaint is deemed filed with both agencies as of that date."); *Yeager v. UPMC Horizon,* 698 F. Supp. 2d 523, 536-39 (W.D. Pa. 2010) (finding PHRA charge of discrimination was untimely where no election to dual file was indicated within the 180-day statutory period); *Seybert v. Int'l Grp. Inc.*, No. 07-3333, 2009 WL 722291, at *17 (E.D. Pa. Mar. 18, 2009) (observing that a claimant must show a request to dual file with the PHRC within the 180-day mandatory filing period). "Indeed, courts within this Circuit have emphasized that claimants must clearly designate their intent to have a charge of discrimination dual-filed with both the PHRC and EEOC in order to preserve their state and federal claims." *Evans*, 2015 WL 4566817, at *6 (citing cases).

Here, Plaintiff filed an EEOC Charge of Discrimination in the form of a Complaint. ECF No. 44-1 (EEOC Charge). That Complaint states that Plaintiff brought the Charge "not only to recover all the damages and remedies available under the Americans with Disabilities Act[,] . . . the

Civil Rights Act of 1964[,] . . . the Pennsylvania Human Relations Act[,] . . . and the Pennsylvania Whistleblower Law[,] . . . but also to fully expose Respondents' unlawful and retaliatory conduct." *Id.* at 2-3.  Throughout the Charge, Plaintiff references claims under the PHRA and her intent to seek appropriate remedies under the PHRA, but at no point does she request that the Charge be dual filed with the PHRC.  *See generally id.*  Plaintiff also fails to provide any signed election to dual file or cover letter requesting that the EEOC dual file her charge with the PHRC.  Merely including PHRA claims within the EEOC charge of discrimination does not rise to the level of "clearly designat[ing her] intent to have a charge of discrimination dual-filed with both the PHRC and EEOC."[7]  *Evans*, 2015 WL 4566817, at *6.  Because Plaintiff's PHRA claims have not been exhausted, any attempt to include them in an amended complaint would be futile.  Accordingly, leave to amend to add Plaintiff's claims under the PHRA is denied.

## C.    Whether Plaintiff's National Origin, Ethnicity, and Religious Discrimination Claims Are Futile

Defendants next challenge Plaintiff's proposed new claims of national origin, ethnicity, and religious discrimination on grounds of futility.  Defs.' Opp. at 11-21.  "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted."  *Holst v. Oxman,* 290 F. App'x 508, 510 (3d Cir. 2008).  The futility analysis on a motion to amend is essentially the same as on a motion under Federal Rule of Civil Procedure 12(b)(6).  *Id.*  Thus, the trial court may deny leave to amend where the amendment would not withstand a motion to dismiss. *Massarsky v. Gen. Motors Corp.,* 706 F.2d 111, 125 (3d Cir. 1983).  Given the liberal standard for

---

[7]    Plaintiff's cited cases are inapposite.  For example, in *Fosburg v. Lehigh Univ.*, No. 98-864, 1999 WL 124458, (E.D. Pa. March 4. 1999), the court found that the plaintiff had exhausted his PHRA claims because he made a "timely request that his charge be filed with the PHRC."  *Id.* at *8.  Similarly, in *Brennan v. Nat'l Tel. Directory Corp.*, 881 F. Supp. 986 (E.D. Pa. 1995), the plaintiff filed her claim with the EEOC, expressly indicated that the matter was to be filed with the PHRC, and EEOC personnel assured her that the claim would be cross-filed.  *Id.* at 998.

the amendment of pleadings, however, "courts place a heavy burden on opponents who wish to declare a proposed amendment futile." *Aruanno v. New Jersey,* No. 06-296, 2009 WL 114556, at *2 (D.N.J. Jan. 15, 2009). "If a proposed amendment is not *clearly* futile, then denial of leave to amend is improper." 6 Wright & Miller's *Federal Practice & Procedure* § 1487 (2d ed.1990) (emphasis added).

Here, Plaintiff seeks to assert new claims of national origin/ethnicity and religious discrimination.[8] To establish a claim of discrimination, a plaintiff must show that an employer had a discriminatory animus against an employee, and that the animus resulted in a challenged action, such as dismissal, failure to promote, or failure to hire. *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 914 (3d Cir. 1983). Absent direct evidence of discrimination, a plaintiff must rely on the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). Under this framework, a plaintiff must plead a *prima facie* case of discrimination, which requires the plaintiff to set forth factual allegations that she (1) is a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999).

Here, Defendants contend that Plaintiff's proposed ethnic/national origin discrimination and religious discrimination claims fail to plead a *prima facie* case on three grounds. First, they argue that Title VII does not permit discrimination/retaliation claims based on ethnicity. Defs.' Opp. at 11-13. Second, they assert that Plaintiff has failed to plead that she is a member of any specific national origin or religious group. *Id.* at 13-17. Finally, they aver that Plaintiff fails to plead facts

---

[8] Defendants do not challenge Plaintiff's proposed new claims under the ADA on grounds of futility. As such, the Court grants Plaintiff leave to amend her complaint to assert these claims.

showing that any Defendant discriminated against her based on either national origin or religion. *Id.* at 17-21.  The Court addresses each argument individually.

1.    Whether Title VII Covers Ethnicity[9]

Defendants posit that the Court should deny Plaintiff's request to amend to add Title VII claims based on ethnicity discrimination—as set forth in Counts Seven and Nine of the Proposed SAC—because ethnicity is not a protected class under these statutes. *Id.* at 11.  Instead, Defendants argue that Title VII only protects against discrimination based on an individual's "race, color, religion, sex, or national origin[.]" *Id.* at 12 (quoting 42 U.S.C. § 2000e-2(a)).  Defendants further assert that because ethnicity is not a protected class, Plaintiff's claims of ethnicity discrimination would fail to state a claim and thus, leave to amend should be denied as futile. *Id.*

"Membership in a protected class is a fundamental aspect of a Title VII claim and in the absence of any pleadings regarding what protected class Plaintiff is a member [of], the claim fails on this basis." *McClaren v. N.J. State Dep't of Educ.*, No. 14-3213, 2015 WL 337481, at *5 (D.N.J. Jan. 26, 2015).  The term "national origin" as used in Title VII, however, has been used interchangeably with ethnicity. *See Santos v. Iron Mountain Film & Sound*, No. 12-4214, 2014 WL 673063, at *3 (D.N.J. Feb. 20, 2014) (using term "national origin" interchangeably with "ethnicity").  Accordingly, ethnicity is a protected class under Title VII. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003).

Given that Title VII covers national origin/ethnicity, and in light of Plaintiff's allegations that she was discriminated/retaliated against due to her Russian/Ukrainian ethnicity, the Court finds no merit to Defendants' first argument.

---

[9]  Plaintiff also seeks leave to bring PHRA claims on the basis of ethnicity, which Defendants oppose on futility grounds.  Because the Court has denied leave to amend to add any PHRA claims for failure to exhaust, the Court need not address this argument.

2.      Whether Plaintiff Pleads that She Is a Member of a Protected Class

Defendants next argue that Plaintiff's claims of national origin and religious discrimination fail to state a claim under Federal Rule of Civil Procedure 12(b)(6) because she does not plead that she was a member of a protected class.  Defs.' Opp. 13-17.  In turn, they contend that Plaintiff's efforts to add these claims via the Proposed SAC are futile.  *Id.* at 17.

As to Plaintiff's claims of national origin/ethnicity discrimination, Defendants' argument is misplaced.  Defendants rely heavily on *Henderson v. Philadelphia Housing Authority*, No. 23-1236, 2024 WL 1254830 (3d Cir. Mar. 25, 2024), where the Third Circuit affirmed the district court's dismissal of a discrimination complaint in which the plaintiff simply alleged that she was a member of a "protected class" without identifying that class.  *Id.* at *2.  Unlike in *Henderson*, however, Plaintiff here specifically identifies her national origin/ethnicity.  The proposed SAC alleges that Plaintiff "is an immigrant of Russian and Ukrainian origin[.]"  Proposed SAC ¶ 32.  Plaintiff further pleads that her "father was born in Ukraine, and as an immigrant of Russian/Ukrainian origin herself, the Russian invasion of Ukraine has taken a great emotional toll on Plaintiff."  *Id.* ¶ 123.  The Proposed SAC alleges that Defendants discriminated and retaliated against her "based on religion, national origin, and/or ethnicity."[10]  *Id.* ¶ 211.

With respect to Plaintiff's claim of religious discrimination, however, the Proposed SAC fares quite differently.  As noted above, membership in a protected class constitutes an element of

---

[10]  Defendants contend that such allegations are insufficient, arguing that "[w]hile [Plaintiff] claims to be a 'Russian/Ukrainian immigrant,' she cannot claim to be from both nations . . . .  As [Plaintiff] well knows, Russia and Ukraine are two different nations with different languages and cultures and their governments have been engaged in armed conflict over their respective interpretations and the implications of these issues since approximately 2014."  Defs.' Opp. at 14-15.

That argument lacks merit.  Plaintiff alleges that she is of *both* Russian and Ukrainian descent and that the Corporate Defendants discriminated against her because of that heritage.  Whether the two countries have cultural and/or political differences is irrelevant for purposes of this case.

a *prima facie* case of Title VII discrimination. *McDonnell Douglas*, 411 U.S. at 802. For religious discrimination claims in particular, employees must have informed their employers of their religious beliefs prior to the alleged discriminatory action because, unlike other bases of discrimination claims like race or gender, an employee's religion is often unknown to the employer. *See Wilkerson v. New Media Tech. Charter Sch.*, 522 F.3d 315, 319 (3d Cir. 2008); *Morrison v. Access Servs., Inc.*, No. 14-4685, 2014 WL 5286604, at *4 (E.D. Pa. Oct. 15, 2024) (quoting *Geraci v. Moody-Tottrup, Int'l, Inc.*, 82 F.3d 578, 581 (3d Cir. 1996)).

Here, Plaintiff fails to plead that she is a member of the Jewish faith. Indeed, the sole references to Plaintiff's religious background consist of the following:

- "Plaintiff objected to Defendant Cook's [antisemitic] comments by explaining that many of her friends are Jewish and that she grew up surrounded by Jewish students and teachers when she was a student at a specialized Physics and Math high school #30 in St. Peter[s]burg, Russia." Proposed SAC ¶ 67.

- "Plaintiff was especially offended by Defendant Cook's antisemitism as Plaintiff's grandmother's parents and young siblings sadly lost their lives in the Holocaust." *Id.* ¶ 68.

- "[O]n February 2, 2023, Plaintiff sent Defendant Medlin the following complaint prior to a meeting with Defendant Medlin to discuss her accommodation request: . . . [describing various complaints regarding Defendant Sangeeta Bardhan Cook] Sangeeta also commented on another occasion that Israelis are the worst to negotiate with. Sangeeta does not know that my grandmother was Jewish and that all her family including little brothers and sisters, was killed (burned alive) by Nazis during the WWII. My grandmother was the only one who survived because she was a nurse at the front. I responded to Sangeeta that all my friends are Jewish and that I grew up surrounded by Jewish students and teachers when I was a student at a specialized physics and math high school in St. Petersburg, Russia." *Id.* ¶ 103.

Nothing in these allegations suggests that Plaintiff herself identified as Jewish. Even in her moving papers, Plaintiff argues only that she has "Jewish familial ties"—not that she herself is Jewish. Pl.'s Mot. at 34.

Based on these allegations, the Proposed SAC fails to state a claim for religious discrimination under Title VII. Although Plaintiff suggests that her grandmother was Jewish, at no point does she claim to be a member of the Jewish faith. Proposed SAC ¶ 68. Moreover, as noted above, Plaintiff admits that Defendant Cook, who was responsible for the alleged antisemitic comments, did not know of Plaintiff's Jewish heritage. *Id.* ¶ 103. Plaintiff's mere allegation that all of her friends are Jewish or that she has Jewish familial ties does not establish the crucial element that she herself is a member of that group.[11] Because Plaintiff has failed in all three iterations of her complaint to plead that she is a member of a protected religious group, the Court finds that Plaintiff's efforts to add a religious discrimination claim would be futile.

3.  Whether Plaintiff Has Pled Facts Showing National Origin Discrimination

Defendants' final challenge to Plaintiff's proposed national origin discrimination claims asserts that Plaintiff fails to plead facts showing that she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination.[12] Defs.' Opp. at 17.

To adequately plead an inference of discrimination, a plaintiff must allege facts upon which a "court can infer that if the employer's actions remain unexplained, it is more likely than not that such actions were based on impermissible reasons." *EEOC v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990). One way that a plaintiff can create such an inference is by asserting that she was

---

[11]  Plaintiff's case citations are inapposite. *See* Pl.'s Reply at 7. Plaintiff cites a series of cases for the proposition that "Plaintiff need not be the subject of the hostile or offensive comments for the conduct to be actionable." *Id.* (citing *Vinson v. Taylor*, 753 F.2d 141, 146 (D.C. Cir. 1985); *Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1416 (10th Cir. 1987); *Hall v. Gus Constr.*, 842 F.2d 1010, 1015 (8th Cir. 1988); *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 610-11 (1993); *Cutler v. Dorn*, 196 N.J. 419, 433 (2008)). While the offensive comments in these cases were not made directly to the plaintiff, the plaintiff—unlike Plaintiff here—was a member of the protected group about which the comments were made.

[12]  Defendant also challenges whether Plaintiff has pled facts showing religious discrimination. Defs.' Opp. at 17. Having already found that Plaintiff's religious discrimination claim is futile for failure to allege membership in a protected class, the Court need not address this argument.

treated less favorably than similarly-situated employees outside of the protected class. *Jones*, 198 F.3d at 413. While "similarly-situated" does not necessarily mean identically situated, the plaintiff must nevertheless be similar in "all relevant respects." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 222-23 (3d Cir. 2009) (citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997)); *see Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) (adopting standard used in other circuits, finding that "to be considered similarly situated, comparator employees must be similarly situated in all relevant respects."). Alternatively, a plaintiff may "rely on circumstantial evidence that otherwise shows a causal nexus between his membership in a protected class and the adverse employment action." *Greene v. V.I. Water & Power Auth.*, 557 F. App'x 189, 195 (3d Cir. 2014).

The Court finds that Plaintiff's Proposed SAC is devoid of allegations connecting Plaintiff's Russian/Ukrainian heritage to any adverse employment action. Plaintiff asserts that, on March 28, 2023, Defendant Cook informed Plaintiff that she needed Plaintiff's Russian language skills to negotiate with a Russian Company that held the rights to a promising anti-cancer drug. Proposed SAC ¶¶ 118-19. Plaintiff agreed to help even though she was apprehensive because the Russian invasion of Ukraine had taken an emotional toll on her. *Id.* ¶¶ 120, 122-23. "Plaintiff [also] worried that Corporate Defendants' affiliations with a Russian company, at the present time could pose serious problems for Corporate Defendants both legally and ethically." *Id.* ¶ 124. After performing her own research, Plaintiff determined that the Russian Company had direct ties to the Russian government, which was allegedly subject to sanctions by the United States. *Id.* ¶¶ 125-28.

Plaintiff raised her legal concerns with Defendant Cook about acquiring intellectual property rights from the Russian Company as well as her ethical concerns given the current geopolitical state created by the situation in Ukraine. *Id.* ¶¶ 130-33. Having not received a satisfactory response from Cook, Plaintiff elevated her concerns to Defendant Maddox, who, according to Plaintiff, likewise dismissed her concerns. *Id.* ¶¶ 134-41. Plaintiff claims that she "understandably feared that her

involvement with this project could pose a serious risk to her career, especially due to her Russian/Ukrainian origin." *Id.* ¶ 142. Accordingly, Plaintiff sent another email to Cook claiming that Cook had knowingly involved her in the Russian Company project "without [Plaintiff] knowing all the problematic background information surrounding it, and this could have created serious problems for [her] in the future, personally and professionally." *Id.* ¶ 143 (emphasis omitted). One day after Plaintiff sent this email to Cook, Defendants placed Plaintiff on a performance improvement plan and gave her a final, written warning, noting that her reports of unlawful conduct "assum[ed] malicious intent in others." *Id.* ¶¶ 144-51. Ultimately, Plaintiff was terminated, effective June 21, 2023. *Id.* ¶ 176. Subsequent to her termination, Plaintiff received an "anonymous" tip that Defendant Cook had "exhibited hostility towards a coworker of Russian/Ukrainian descent at her previous job," and that Cook had referred to Plaintiff as the "Crazy Russian Lady" in writing. *Id.* ¶ 180(d).

These allegations, however, do not permit an inference that Plaintiff's termination was causally connected to her Russian/Ukrainian heritage. While Cook's singular remark about Plaintiff being a "Crazy Russian Lady" could conceivably "constitute evidence of the atmosphere in which [an] employment decision was carried out," such a stray remark standing alone is insufficient to establish discriminatory intent. *See Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 521 (3d Cir. 1997); *see also Rivera v. PRA Health Scis.*, No. 22-2251, 2023 WL 7021183, at *11 (E.D. Pa. Oct. 24, 2023) (finding that a single stray comment by a supervisor about a plaintiff's national origin, otherwise untethered to the adverse employment decision, was insufficient to establish a causal connection); *Leeson v. Dejoy*, No. 20-828, 2020 WL 7264067, at *2 (W.D. Pa. Dec. 10, 2020) (granting motion to dismiss where apart from identifying his religious affiliation, plaintiff failed to identify any specific facts creating a plausible link between that religious affiliation and his removal from employment); *Gulati v. Chao*, No. 17-6271, 2019 WL 4597567, at *8 (D.N.J. Sept. 23, 2019)

(finding that "minimal alleged comments regarding Plaintiff's race and national origin" are "stray remarks that are insufficient to give rise to an inference of discrimination"); *Elmarakaby v. Wyeth Pharms., Inc.*, No. 09-1784, 2015 WL 1456686, at *7 (E.D. Pa. Mar. 30, 2015) (finding that "vague comment from a supervisor" about plaintiff's national origin did not establish a "facially plausible" claim of discrimination).  This is particularly true where Plaintiff alleges no temporal proximity between the remark and the adverse employment action.

Given that the addition of a national origin discrimination claim would clearly be futile— *i.e.*, it would not withstand motion to dismiss under Rule 12(b)(6)—the Court denies leave to amend.[13]

**D.**    **Pennsylvania Whistleblower Law ("PWL") Claims**

Plaintiff also seeks to add a claim under the Pennsylvania Whistleblower Law, 43 Pa. Stat. §§ 1421-1428.  The PWL states in relevant part:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 Pa. Stat. § 1423(a).  A "good faith report" is defined as one "made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true."  *Id.* § 1422.

---

[13]    It remains unclear from the Proposed SAC whether Plaintiff is also attempting to plead a hostile work environment claim.  Defendant provides an analysis of why such a claim would be futile.  Defs.' Opp. at 20-21.  Plaintiff, however, does not address the addition of such a claim in her initial motion to amend or her reply brief, arguing only that she is seeking leave to add discrimination claims.  *See* Pl.'s Mot. at 33-35.  Accordingly, the Court presumes that no such claim is present.

To establish a *prima facie* case under the PWL, a plaintiff must prove "'by a preponderance of the evidence, that, prior to the alleged acts of retaliation, [s]he had made a good faith report of wrongdoing to appropriate authorities.'" *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 504 (M.D. Pa. 2015) (quoting *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1200 (Pa. 2001) (internal quotations omitted)). The plaintiff must also present evidence of a causal connection between her report of wrongdoing and the alleged acts of retaliation. *Golaschevsky v. Dep't of Env't Prot.*, 720 A.2d 757, 759-60 (Pa. 1998). If the plaintiff sets forth a *prima facie* case of retaliation, "the burden shifts to the defendant employer to show its actions were lawful." *Johnson v. Res. for Hum. Dev., Inc.*, 789 F. Supp. 2d 595, 601 (E.D. Pa. 2011) (citing *O'Rourke*, 778 A.2d at 1200). If the employer can then demonstrate, by a preponderance of the evidence, that the action taken "'occurred for separate and legitimate reasons, which are not merely pretextual,'" the employer will not be held liable. *Id.* (quoting 43 Pa. Stat. § 1424(c)).

Defendants contend that Plaintiff's addition of a PWL claim would be futile because the claim is untimely, does not relate back to Plaintiff's prior pleadings, and otherwise fails to state a plausible basis for relief. Defs.' Opp. at 21.

1.    Relation Back

Defendants first argue that Plaintiff's whistleblower claim is futile because it barred by the applicable statute of limitations. *Id.* Specifically, Defendants note that the alleged retaliation—*i.e.*, Plaintiff's termination from Defendants' employ—occurred on June 21, 2023. *Id.* at 21-22. Under the PWL's 180-day statute of limitations, Plaintiff was required to file her complaint by December 21, 2023. *See* 43 Pa. Stat. § 1424(a). Defendants posit that although Plaintiff initiated an action in New Jersey Superior Court in July 2023, she did not include a PWL claim in her original Complaint and never sought to add such a claim until approximately two years after the statute of limitations expired. Defs.' Opp. at 22.

Plaintiff responds that her PWL claim "undisputedly relates back to her first Complaint filed on July 11, 2023, in which she details the factual allegations that gave rise to her claim under CEPA." Pl.'s Mot. at 37.  She contends that, under the liberal relation back rule of Federal Rule of Civil Procedure 15(c)(1)(B), Defendants were given fair notice that they would be liable under the PWL "as they were aware Plaintiff had brought forth similar claims under New Jersey law in her Complaint." *Id.* at 38.

The Court finds merit to Plaintiff's relation back defense.  "Where the statute of limitations has expired, a plaintiff may only add a new claim or name a new party if the plaintiff demonstrates that the new claim or party relates back to the filing date of the original complaint." *Ferencz v. Medlock*, 905 F. Supp. 2d 656, 665 (W.D. Pa. 2012).

> An amendment to a pleading relates back to the date of the original pleading when:
>
> (A) the law that provides the applicable statute of limitations allows relation back;
>
> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading; or
>
> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:
>
>> (i)    received such notice of the action that it will not be prejudiced in defending on the merits; and
>>
>> (ii)   knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c)(1); *see also Garvin v. City of Phila.*, 354 F.3d 215, 222 (3d Cir. 2003).

"Notice is the 'linchpin' of Rule 15(c)." *Armstrong v. Gretsky*, No. 20-160, 2023 WL 2903977, at *10 (E.D. Pa. Apr. 11, 2023) (quoting *Colbert v. City of Phila.,* 931 F. Supp. 389, 392 (E.D. Pa. 1996)), *aff'd*, No. 23-1765, 2024 WL 1045230 (3d Cir. Mar. 11, 2024).  Subsection (c)(1)(B) requires "the existence of a common 'core of operative facts' uniting the original and newly asserted claims." *Mayle v. Felix*, 545 U.S. 644, 659 (2005).  A common core of operative facts exists if "the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds." *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004).  Thus, new claims will relate back if they "restate the original claim with greater particularity or amplify the factual circumstances surrounding the pertinent conduct, transaction or occurrence in the preceding pleading." *Id.*  If, however, a new claim "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth," the claim will not relate back. *Mayle*, 545 U.S. at 650.  Stated differently, "only where the opposing party is given fair notice of the general fact situation and the legal theory upon which the amending party proceeds will relation back be allowed[;] . . . amendments that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously." *Glover v. FDIC*, 698 F.3d 139, 146 (3d Cir. 2012) (cleaned up).

Here, the Court finds that the original and First Amended Complaint gave Defendants fair notice of Plaintiff's PWL claims.  The original Complaint, filed on July 11, 2023, specifically alleged that Plaintiff "[blew] the whistle on Corporate Defendants' unethical and unlawful business affiliations with Russian companies financed by a sanctioned Russian fund." ECF No. 1-1 (Compl.) at 19 (cleaned up).  The Complaint went on to detail how Plaintiff discovered that the Russian Company, with whom the Corporate Defendants intended to do business, had been sanctioned by the United States for violations of international law and for being owned or controlled by the Russian government, in direct contravention of Executive Order 14024.  *Id.* ¶ 96.  Plaintiff raised her

concerns with Defendants on several occasions.  *Id.* ¶¶ 98-108.  One day later, Defendants issued Plaintiff a final written warning and placed her on a performance improvement plan.  *Id.* ¶ 112.  On April 20, 2023, Plaintiff sent Defendants notice of her intent to file this lawsuit.  *Id.* ¶ 120.  The Complaint asserted that two months later, following increased work expectations on Plaintiff, Defendants terminated her employment "in retaliation for her blowing the whistle on Corporate Defendants' unlawful, unethical business dealings with a Russian company sponsored by a sanctioned fund with direct ties to the Russian government."  *Id.* ¶¶ 124, 130, 132.  Count Four of the original Complaint then pled a claim under CEPA.[14]  *Id.* ¶¶ 173-81.

The Proposed SAC repeats all of these allegations and then brings a new claim for violation of the PWL.  Proposed SAC ¶¶ 115-76, 266-70.  Both the CEPA claim raised in the original Complaint and the PWL claim in the Proposed SAC rest on the same common core of operative facts but differ only on the specific statute relied upon for relief.  Defendants cannot argue that they did not have notice of either the underlying facts or Plaintiff's assertion of a whistleblower retaliation claim, whether under CEPA or the PWL.  Under the liberal standard of Rule 15(c), the Court finds that this claim relates back.[15]

---

[14]  Plaintiff's CEPA claim is misnumbered as a second Count Four.  The Court has followed the numbering in the Complaint to avoid ambiguity.

[15]  Defendants contend that the relation back argument fails "because the factual allegations set forth in her Complaint and FAC focused on a Presidential Executive Order she claimed to have been violated, which cannot form the basis for protected activity under the PWL."  Defs.' Opp. at 23.  Defendants then go into an analysis of how violation of an Executive Order does not constitute either "wrongdoing" or "waste" as defined in the PWL.  *Id.* at 23-24.  That argument, however, goes to futility—not relation back.  Moreover, even assuming that Defendants are correct that "the PWL protects a distinct and significantly more focused scope of conduct relative to CEPA," Defs.' Opp. 24, Defendants fail to explain how Plaintiff's challenge to a broader swath of conduct in the original Complaint failed to put them on notice of the purportedly narrower conduct set forth in the Proposed SAC.

2.      Whether the PWL Claim Is Futile

Alternatively, Defendants contend that Plaintiff's PWL claim is futile.  Defs.' Opp. 25-28. As noted above, the PWL makes it unlawful for an "employer to 'discharge, threaten or otherwise discriminate or retaliate against an employee . . . because the employee . . . makes a good faith report . . . to the employer or appropriate authority [of] an instance of wrongdoing or waste by a public body." 43 Pa. Stat. § 1423(a).  The PWL defines "employer," in relevant part, as "[a] corporation for profit . . . which receives money from a public body to perform work or provide services."  *Id.* § 1422.   The definition of "public body" includes "[a]ny other body which is created by Commonwealth or political subdivision authority or which is funded in any amount by or through Commonwealth or political subdivision authority or a member or employee of that body."  *Id.*  The Act then defines "waste" as "[a]n employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources."  *Id.*  "Wrongdoing" is defined as "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."  *Id.*

Against this statutory backdrop, Defendants make three futility arguments.  First, Defendants assert that Plaintiff's claim that she reported concerns regarding Defendants' potential violation of Executive Order 14024 cannot sustain an allegation of protected activity under the PWL "because an Executive order is not a Federal or State statute or regulation, or a code of conduct or ethics[,]" as defined in the PWL.  Defs.' Opp. at 25-26.  They reason that—albeit in a completely different context—the Third Circuit has held that an Executive Order is not a "law of the United States."  *Id.* (citing *Loc. 1498, Am. Fed'n of Gov't Emps. v. Am. Fed'n of Gov't Emps., AFL/CIO*, 522 F.2d 486,

491 (3d Cir. 1975) (holding that an Executive Order was not a law of the United States for purposes of creating federal question jurisdiction under 28 U.S.C. § 1331)).

That argument is misplaced. Defendants, who bear the burden of proving futility, have cited no authority for the proposition that an employee's reports of a potential violation of an Executive Order do not fall within the ambit of protected conduct under the PWL. Indeed, the Third Circuit has found "no doubt" that "executive orders and regulations have the force of law." *Farmer v. Phila. Elec. Co.*, 329 F.2d 3, 8 (3d Cir. 1964). "Courts in this district have easily concluded the same." *Consol. Rail Corp. v. Aspen Specialty Ins. Co.*, No. 17-12281, 2019 WL 2425118, at *7 (D.N.J. June 10, 2019) (citing cases). Accordingly, the Court declines to find this proposed claim futile on this ground.

Defendants' second argument, however, has significantly more merit. Defendants assert that Plaintiff's factual allegations do not allege a report of wrongdoing under the PWL because they relate to future, hypothetical conduct and not prior alleged wrongdoing. Defs.' Opp. at 26. The Court agrees.

The Pennsylvania Superior Court has held that "to prove a violation of the Whistleblower Law, [a plaintiff] must demonstrate she made a report of some action by her employer or its agent, which, if proven, would constitute a violation of a law or regulation. Moreover, the report must be of an actual violation, not a potential or contemplated violation." *Greco v. Myers Coach Lines, Inc.*, 199 A.3d 426, 434 (Pa. Super. Ct. 2018); *see also Anderson v. Bd. of Sch. Dirs. of the Millcreek Twp. Sch. Dist.*, 574 F. App'x 169, 173-74 (3d Cir. 2014) (holding that a plaintiff's statement that another employer might engage in certain illegal conduct in the future does not constitute whistleblowing activity under the PWL); *Olson v. Lehigh Univ.*, 297 A.2d 732 (Pa. Super. Ct. 2023) (requiring an actual violation as opposed to a potential or contemplated allegation). "This test is objective: it is not sufficient that a plaintiff subjectively believes or believed that a public entity

36

engaged in wrongdoing." *Sweda v. Upper Bucks Cnty. Tech. Sch.*, No. 22-1787, 2023 WL 5351980, at *10 (E.D. Pa. Aug. 18. 2023); *see also Peck v. Bolognone*, 24-2182, 2025 WL 1262957, at *2 (3d Cir. May 1, 2025) (affirming dismissal of a PWL claim "[b]ecause these violations were 'potential or contemplated' as opposed to 'actual,'" and thus, plaintiff's report was not protected).

The allegations of the Proposed SAC allege only a potential or contemplated violation of law. Plaintiff claims that she conducted approximately thirty minutes of research of publicly-available information to discover that the Russian Company was sponsored by a United States sanctioned Russian entity with direct ties to the Russian government. *Id.* ¶¶ 124-28. Based on this research, Plaintiff believed there was a substantial risk with the Corporate Defendants' plans to acquire the intellectual property covering the drug. *Id.* ¶ 129. Plaintiff raised her concerns with Cook and remarked that proceeding with the deal would be in direct violation of President Biden's Executive Orders involving Russia-related sanctions. *Id.* ¶¶ 130-32. During an April 14, 2023 Teams call with Cook and Maddox, Plaintiff reiterated her belief that it was *unethical* for the Corporate Defendants to negotiate and enter into a deal with a company likely financed by a sanctioned Russian entity. *Id.* ¶ 138 (emphasis added). Maddox called Plaintiff on April 18, 2023, and told her that the Corporate Defendants would "be okay with the PR" if the deal went forward. *Id.* ¶ 140.

Regardless of the validity of Plaintiff's concerns, these allegations allow no inference of either an actual or imminent violation of any law. By all accounts, Defendants had not even begun negotiation with the Russian Company but rather were merely considering entering into a deal to acquire certain intellectual property. Many of Plaintiff's voiced concerns objected to the ethicality of the deal as opposed to its illegality. Ultimately, Plaintiff's subjective belief that Defendants were potentially going to engage in wrongdoing is an insufficient basis on which to premise a PWL claim.

Finally, even if Plaintiff's allegations could be broadly construed as complaints of "wrongdoing," Defendants correctly note that she has failed to plead causation. Defs.' Opp. 26-28. A *prima facie* case requires more than evidence of the mere fact of a report followed by a termination. *Lutz v. Springettsbury Twp.*, 667 A.2d 251, 254 (Pa. Commw. 1995). Rather, "[i]n order to sustain a Whistleblower Law claim, a plaintiff must plead facts or surrounding circumstances that support an inference that the report of waste [and/or wrongdoing] led to her dismissal." *Bennett v. Republic Servs., Inc.*, 179 F. Supp. 3d 451, 456 (E.D. Pa. 2016). "An employee who has been terminated based on a filed report and wants to base his or her complaint on their employer's violation under the Whistleblower Law must specify how their employer is guilty of waste and/or wrongdoing." *Gray v. Hafer*, 651 A.2d 221, 225 (Pa. Commw. 1994), *aff'd*, 669 A.2d 33d (Pa. 1995). Furthermore, the employee "must also show by concrete facts or surrounding circumstances that the report led to [her] dismissal, such as that there was specific direction or information [she] received not to file the report or there would be adverse consequences because the report was filed." *Id.*; *see also Baker v. Benton Area Sch. Dist.*, 418 F. Supp. 3d 17, 57 (M.D. Pa. 2019) (citing *Gray*, 651 A.2d at 224).

Temporal proximity between the whistle-blowing activity and the adverse employment action is one circumstance that may support an inference of a causal connection. *E.g.*, *McAndrew v. Bucks Cnty. Bd. of Comm'rs*, 982 F. Supp. 2d 491, 505 (E.D. Pa. 2013). If "temporal proximity" is not "unusually suggestive," courts must examine whether "the proffered evidence, looked at as a whole, may suffice to raise the inference of causation." *Kerrigan v. Otsuka Am. Pharm., Inc.*, 706 F. App'x 769, 772 (3d Cir. 2017) (citation and internal quotation marks omitted). Courts measure temporal proximity from the first date on which the plaintiff engaged in protected activity. *Blakney v. City of Phila.*, 559 F. App'x 183, 186 (3d Cir. 2014). Lapses in time of more than a month between the protected activity and the adverse employment action are not deemed "unusually suggestive."

*See Thomas v. Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (finding three weeks not unusually suggestive).

Here, Plaintiff fails to show that she filed any report identifying any specific wrongdoing, only that she raised her concerns with Cook and Maddox about the potential Executive Order violation resulting from the deal. Proposed SAC ¶¶ 124-39. These conversations occurred between April 14, 2023, and April 17, 2023. *Id.* ¶¶ 138-40. Plaintiff also sent an extensive email to Defendant Cook about Cook's attempts to involve Plaintiff in an allegedly unlawful and unethical Russian transaction. *Id.* ¶ 143. One day later, Defendants issued Plaintiff a final written warning and placed her on a performance improvement plan because of Plaintiff "assuming malicious intent in others." *Id.* ¶¶ 149-51. After two months on the PIP, Defendants terminated her. *Id.* ¶¶ 169-76. Plaintiff cites no "concrete facts" occurring in the interim that suggest she received any specific direction not to file a report regarding the Russian deal or that there would be adverse consequences. Given that Plaintiff alleges nothing more than "the mere fact of a report followed by a termination," *Johnson v. Res. for Hum. Dev.*, 789 F. Supp. 2d 595, 602 (E.D. Pa. 2011), she has failed to set forth a *prima facie* case.

In short, the Court finds that Plaintiff's proposed PWL claim would be futile because it fails to state a plausible claim for relief. The Proposed SAC is devoid of allegations that Plaintiff reported any actual wrongdoing by Defendants. And even assuming that such a report existed, Plaintiff has failed to allege a causal connection between her complaints and her termination. Accordingly, leave to amend to assert a PWL claim is denied.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Leave to File an Amended Complaint is granted in part and denied in part as follows:

1. Plaintiff's request for leave to add factual allegations to establish her entitlement to the protections of NJLAD and CEPA is **DENIED**;

2. Leave to add claims under the ADA is **GRANTED**;

3. Leave to add claims for national origin/ethnic or religious discrimination under Title VII and the PHRA is **DENIED**;

4. Leave to add a claim under the PWL is **DENIED**; and

5. To the extent Plaintiff seeks leave to add allegations supporting her remaining claims of discrimination and retaliation—found in the Proposed SAC at paragraphs 178-183— leave is **GRANTED**.

An appropriate Order follows.

s/Elizabeth A. Pascal
ELIZABETH A. PASCAL
United States Magistrate Judge

cc:  Edward S. Kiel, U.S.D.J.